JOHN P. REILLY & others *vs.* SCHOOL COMMITTEE OF BOSTON & another.

Suffolk.   October 6, 1972. — December 6, 1972.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Moot Question. Equity Jurisdiction*, Declaratory relief. *School and School Committee. Equity Pleading and Practice*, Moot case.

In a suit in equity by representatives of a public school teachers union against a municipal school committee for declaratory and injunctive relief respecting hiring practices of the committee in relation to a then existing collective bargaining agreement, where a declaration made by the final decree expired by its terms on a date coincident with the expiration of such agreement and an appeal from the decree was not reached for argument in this court until more than a year after such date and after a further agreement had expired and still another agreement was presumably operative or being negotiated, this court held the issue raised by the decree moot and ordered that the decree be vacated, not on the merits, and that the bill be dismissed. [692–696]

BILL IN EQUITY filed in the Superior Court on May 28, 1971.

The suit was heard by *Kalus*, J.

*John F. McMahon* for the plaintiff.

*Edith W. Fine,* Assistant Corporation Counsel, for the defendants.

KAPLAN, J.  In a suit for a declaration of rights and an injunction, the Superior Court made a declaration in favor of the defendants, and the plaintiffs appeal.

In March, 1971, the defendant school committee of the city of Boston (school committee) appropriated [1] $82,744,779 for general school purposes for the fiscal year (January through December, 1971), of which $2,656,910 was allocated for temporary teachers, i.e. daily substitutes and long-term substitutes. [2]  At the same time the school committee formally requested the mayor to recommend to the city council the appropriation of an additional $13,485,076 for the same period, of which $544,190 was intended for the salaries of temporary teachers.  In this attempt to secure additional funds the school committee was substantially disappointed; it received from the mayor and city council only $8,000,000.  A number of suggestions were generated and put before the school committee to accomplish the necessary savings, and some were approved.  One was a suggestion to "[r]educe the use of temporary teachers to replace absent teachers."  This was aimed at saving some $450,000 during the fiscal year.  It was adopted by a vote of three to two on May 25 to go into effect on June 1. [3]  By this time not much was left of the school year: generally in the system the year was to end on June 24; for high school seniors it had already ended on May 14.

The school committee did not issue any directive in terms restricting the use of temporary teachers.  Rather

---

[1] See St. 1936, c. 224, § 2; St. 1948, c. 334; § 1; St. 1949, c. 117, § 1; St. 1963, c. 786, §§ 2, 3; St. 1966, c. 642, § 13.

[2] "Daily" and "long term" substitutes are occasional employees, the former hired on a day to day basis, the latter when absences are expected to last two weeks or longer.  ("Permanent" substitutes and "provisional teachers" are regular employees, not involved here.)

[3] Superintendent of Schools Ohrenberger advised against the suggestion.  He thought it would violate the contract with the Teachers Union.

a new procedure was installed for requisitioning daily substitutes (long-term substitutes were not affected). The usual practice had been for the administrative head of a school desiring a daily substitute to call the teacher placement department of the school committee which would then routinely supply the substitute. Under the new procedure the administrative head was to call the area assistant superintendent of schools, who might then call the placement department. With the added control it was expected that various expedients or makeshifts would be found to obviate as far as possible the use and cost of daily substitutes; for example, the classes of absent teachers might be absorbed in other classes.

The situation in high schools after June 1 was evidently alleviated by the fact that the seniors had departed, releasing some teacher-time to cover absences. As to the other schools, it appears from the evidence regarding the short interval from June 1 to June 3, the date when the present suit was tried, that the new procedure had the effect of reducing considerably, but not eliminating, the use of daily substitutes.

On May 28, 1971, a few days before the new procedure was to become effective, the plaintiffs as representatives of Boston Teachers Union, Local 66, American Federation of Teachers, A.F.L.–C.I.O., brought this suit against the school committee and the city of Boston. The bill charged that for the school committee to "discontinue" (the word was not quite accurate) the hiring of substitutes would constitute a breach of its collective bargaining agreement with the union then in force and extending to August 31, 1971. Specifically the union pointed to article III H (4) (b) of the agreement which stated that "It is the policy of the Committee that substitutes shall be hired to cover classes of regularly assigned teachers when they are absent." It pointed also to article III A which recognized that "it is desirable to attempt to reach" (that is, not to exceed) certain class size maxima for the 1970–1971 school year which were then set out; and to article III B setting out a "basic

maximum" workload for home room teachers. The bill prayed for a declaration of rights under G. L. c. 231A, together with injunctive relief. The defendants' answer, filed June 3, after denials, alleged that the grievance and arbitration procedure set out in the contract was the exclusive method of enforcing its terms, and that the vote of May 25 was forced upon the school committee by the refusal of a part of the requested excess appropriation.

The suit was promptly tried on June 3, and the judge entered his findings, rulings, and order for decree on June 9. He found the facts on the lines of our narrative above. He thought the school committee's duty as to hiring substitutes was not an absolute one, having been expressed only as a "policy"; and the provisions as to maximum class size and teachers' workloads were apparently to be read with a similar qualification. The contract "must be interpreted in view of the political and economic facts of life," including the "fact that the School Committee . . . does not have ultimate fiscal autonomy." Considering the emergency conditions and the short time span involved, the procedure adopted could not be said to be "a material or significant violation of the 'Policy' . . . as that term is used in the contract . . . ." Accordingly, the judge declared that the school committee was entitled to continue the new practice regarding the hiring of substitutes during the remaining period of the collective bargaining agreement. This declaration, however, was stated to be without prejudice to the union's right to resort to the grievance procedure if the hiring practice should result in particular grievances.

A final decree was entered on June 30, 1971. The plaintiffs showed no haste in pressing their appeal. It reached argument in this court in October, 1972. After these many months, coercive relief would be wholly inapposite. This the plaintiffs recognize. Yet they urge us to consider the appeal on the merits and declare the rights and duties of the parties. But a declaration by this court would necessarily be grounded on the facts of

record, those proved at trial in June, 1971. The question naturally arises, and is argued in the briefs, whether it is not inferable from that record, aided by common sense, that the situation has so changed and has such potentialities for further transformations in the future that to pass now on the correctness of the declaration made nearly a year and a half ago would be a useless and inappropriate exercise.

The declaration appealed from expired by its terms on August 31, 1971. That was also the expiration date of the parties' agreement for 1970–1971, which alone gave the plaintiffs their basis of complaint. Since then another year's contract has come and gone,[4] and still another is presumably now operative or under negotiation. The course of the collective bargaining process is of course not shown on the record, but the question of substitutes was and will continue to be a legitimate subject of bargaining and could be resolved by bargaining or shown up in varying lights as other issues are settled by bargaining. Even if the terms of the contract and the background on which it operates should remain stationary, a renewed dispute over hiring substitutes would very likely be taken to arbitration under the aegis of new legislation,[5] and in that event the declaration here sought on the present record might well prove more an embarrassment than a help to the arbitrators.

Again, the stated period of the hiring procedure adopted by the school committee in June, 1971, ended with the fiscal year on December 31, 1971. This measure of economy was one of a set of responses by the school committee to a particular, exigent situation. It is highly problematical whether a similar complex of facts will present itself in the future, and, if it does, whether the school

---

[4] During argument counsel volunteered that the agreement for 1971–1972 repeated the provisions referred to above, but in some other respects the text of the agreement differed from the preceding one.

[5] Statute 1972, c. 375, amending G. L. c. 149, § 178K, as previously amended by St. 1970, c. 445, strengthens the arbitral machinery for contracts between municipal employers and employee organizations by importing the provisions of G. L. c. 150C, the chapter governing "Collective Bargaining Agreements to Arbitrate."

committee or others will respond as they did in 1971. Involved are the fluctuating financial position of the school committee and the possibilities of resort to the mayor and city council for additional funds; the attitudes of the city authorities toward such requests and their ability to meet them; the priorities that the school committee would establish in case of a financial stringency which compelled belt-tightening somewhere along the line.

Sensing, perhaps, that the total situation is too unstable for a declaration, the plaintiffs intimate that a piece might be carved out more suited to the purpose. Thus they seek to show that the amount of $2,656,910 originally allocated for temporary teachers, plus the $94,000 remaining for temporary teachers from the additional appropriation after effect is given to the projected saving of $450,000, would have been sufficient to cover the cost of temporary teachers who would have been normally requisitioned during the balance of the fiscal year; they suggest that a declaration could be made that on such facts, and presumably with contract provisions like those in force during 1970–1971, the school committee would not be entitled to adopt the restrictive hiring policy. The supposed facts and calculations are seriously disputed by the school committee, and it would also dispute any assumption that its initial itemizations of funds are frozen to the extent suggested regardless of changing needs or conditions. See *Collins* v. *Boston,* 338 Mass. 704, 707–709. Cf. *Fitchburg Teachers Assn.* v. *School Comm. of Fitchburg,* 360 Mass. 105, 108. In all events, we do not think a declaration on the limited question would afford much practical guidance to the parties in facing up to the vicissitudes of the future. Cf. *Silverman's Liquor Mart, Inc.* v. *Licensing Bd. for Boston,* 348 Mass. 524, 530–531.

This account of changes in circumstances that have occurred since the declaration below and are yet to be anticipated is, we think, enough to show that a reëxamination of that declaration would be fruitless and possibly misleading. The case is thus comparable to the many in

which appeals in suits for declaratory or injunctive relief have been held moot by reason of materially changed conditions. *Hubrite Informal Frocks, Inc.* v. *Kramer,* 297 Mass. 530, 532–534. *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 329 Mass. 243, 246–247. *Caputo* v. *Board of Appeals of Somerville,* 330 Mass. 107, 111–112. *McLaughlin* v. *Board of Appeals of Harwich,* 359 Mass. 416, 419. *Linn Plywood Corp.* v. *Millmen's Union,* 222 Ore. 265, 268–269. See *Winch* v. *Registrar of Motor Vehicles,* 334 Mass. 271, 273–274. See also Borchard, Declaratory Judgments (2d ed.) 81–86; Note, 62 Harv. L. Rev. 787, 795. Stated in another way, a review of the declaration at the present time would be inadvisable because the case put to the trial judge has spent itself; the situation is evidently not a continuing one, compare *Callahan* v. *Woburn,* 306 Mass. 265; *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693; *Norton Teachers Assn.* v. *Norton,* 361 Mass. 150, nor is it in its nature recurrent with relatively fixed factors that are likely to replicate themselves at intervals in the future. Compare *Moore* v. *Ogilvie,* 394 U. S. 814, 816; Note, 83 Harv. L. Rev. 1672, 1685–1687.

We are, of course, far from intimating that a declaration may never be made that deals with future events subject to contingencies. On the contrary, when the contingencies can be well defined, a declaration may peculiarly serve the purpose of the declaratory procedure "to remove, and to afford relief from, uncertainty and insecurity . . ." (G. L. c. 231A, § 9). See *Boston Ins. Co.* v. *Fawcett,* 357 Mass. 535, 537; *American Mach. & Metals, Inc.* v. *De Bothezat Impeller Co. Inc.* 166 F. 2d 535, 536–537 (2d Cir.), cert. den. 339 U. S. 979; *Seguros Tepeyac, S. A., Compania Mexicana de Seguros Generales* v. *Jernigan,* 410 F. 2d 718, 729 (5th Cir.), cert. den. 396 U. S. 905. Here, however, the trial judge could not have defined the contingencies beyond the emergency of 1971, nor did he attempt to do so; still less can this court attempt such a definition.

As we hold that the plaintiffs may not obtain an appellate review of the decree on the merits, they should be free of collateral estoppel consequences of that decree if any issues of fact or law determined by the judge below should perchance reappear in future litigation between the parties. See *Kalmus* v. *Kalmus,* 330 Mass. 41, 47; *Knowlton* v. *Swampscott,* 280 Mass. 69, 72–73; *Gelpi* v. *Tugwell,* 123 F. 2d 377, 378 (1st Cir.) ; Restatement: Judgments, § 69 (2) (1942). To emphasize this point we now, in conformity with our past practice when a case becomes moot on appeal, vacate the decree appealed from with a notation that the decision is not on the merits, and remand the case to the Superior Court with directions to dismiss the bill. See, e.g. *McLaughlin* v. *Board of Appeals of Harwich,* 359 Mass. 416, 419–420; *Vigoda* v. *Superintendent of Boston State Hosp.* 336 Mass. 724, 726–727.[6]

*So ordered.*

---

[6] The result should be the same even if such formal precautions are omitted. But see *United States* v. *Munsingwear, Inc.* 340 U. S. 36, criticized in Developments in the Law – Res Judicata, 65 Harv. L. Rev. 818, 847–848; Hart & Wechsler, The Federal Courts and the Federal System, 121 (1953).