BOSTON TEACHERS UNION, LOCAL 66, AMERICAN
FEDERATION OF TEACHERS (AFL-CIO) & others[1] *vs.*
SCHOOL COMMITTEE OF BOSTON & others[2]
(and a companion case[3]).

Suffolk.    March 3, 1976. — June 11, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER,
& WILKINS, JJ.

*Boston.   School and School Committee.   Arbitration.   Labor.   Con-
tract,* Collective bargaining contract, With municipality.   *Municipal
Corporations,* Collective bargaining, Contracts, Municipal finance.
*Evidence,* Presumptions and burden of proof.   *Statute,* Special act.

The terms of a collective bargaining agreement between a school com-
mittee and a teachers' union, in which the school committee ex-
pressed its policy to limit class size and teaching load by agreeing
to hire substitute teachers to cover classes in the absence of regu-
larly assigned teachers, did not infringe on the school committee's
managerial prerogative and were enforceable where there was no
evidence of a change in educational policy and funds were available
to implement the terms of the agreement.   [460-464]
Where an arbitrator had found that funds were available on certain
days to hire substitute teachers as required by a collective bargaining
agreement between a teachers' union and a school committee and

---

[1] The plaintiffs in the action commenced on behalf of the Boston
Teachers Union are John Doherty, president, and Henry Robinson,
executive vice-president, individually and as member officers and repre-
sentatives of the union and its members, and as representatives of "all
classroom teachers and other persons represented by the [union]."

[2] The defendants named in the action commenced by the union are
the members of school committee, individually and as they constitute
the school committee; the city of Boston; Kevin H. White, individually
and as mayor of the city of Boston; and John F. Fitzpatrick, indi-
vidually and as auditor of the city of Boston.

[3] The plaintiffs in the companion case (*School Committee of Boston
v. Boston Teachers Union, Local 66, American Federation of Teachers
[AFL-CIO]*, Suffolk Superior Court No. 97088 Eq.) which, in effect,
was commenced by the city, are the School Committee of Boston, the
mayor, the city auditor, and the city treasurer. The defendants are
John Doherty, president, and Henry Robinson, executive vice-presi-
dent, individually and as members, officers, and representatives of the
membership of the union.

where evidence before the court showed that on those days there were sufficient funds available in the budget classification from which substitute teachers were to be paid, the school committee did not satisfy its burden to show that no such funds were in fact available by merely showing that during the entire year it had expended more than had been appropriated for general school purposes. [464-466]

In a dispute concerning a provision in a collective bargaining agreement between a teachers' union and a school committee, the arbitrator exceeded his authority by requiring the city to pay damages to the union's scholarship fund since the city could not lawfully appropriate funds for such a purpose. [466-468]

In a proceeding brought by a teachers' union seeking a declaration that a school committee had a duty to hire substitute teachers under a collective bargaining agreement which had expired before judgment was entered in the case it was proper to make a declaration of the future duties of the mayor and the school committee respecting the hiring of substitute teachers where the terms of the agreement concerning substitute teachers had been continued from year to year. [468-475]

In an action by a city to vacate an arbitration award in a dispute with a teachers' union over the provisions of a collective bargaining agreement in which the city requested a determination that no funds were available to enforce the provisions, no declaratory relief regarding the city's future obligations should have been granted where the union requested no declaratory relief. [469]

In a proceeding brought by a teachers' union seeking a declaration that a school committee had a duty to hire per diem substitute teachers pursuant to a collective bargaining agreement, the judgment was in error in stating that funds could be expended by the school committee in disregard of the amount of appropriated funds, and in enjoining the city and others from interfering with the hiring of substitute teachers unless the provisions of G. L. c. 149, § 178I and G. L. c. 150E, § 7, were complied with, where the requirements of the statutes were unclear. [471]

Under the provisions of G. L. c. 150E, the mayor of the city of Boston may not refuse to submit to the city council a request for funds necessary to meet the needs of a collective bargaining agreement between a teachers' union and the School Committee of Boston. [471-475]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on December 13, 1972.

BILL IN EQUITY filed in the Superior Court on April 13, 1973.

On transfer of the first case to the Superior Court, the cases were consolidated for trial and were heard by *Brogna,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Marilyn L. Sticklor,* Assistant Corporation Counsel (*Herbert P. Gleason,* Corporation Counsel, with her) for the School Committee of Boston & others.

*Albert L. Goldman* for Boston Teachers Union, Local 66, American Federation of Teachers (AFL-CIO) & others.

WILKINS, J.   These two cases, which were consolidated for trial, concern the rights and obligations of the Boston Teachers Union and its members, on the one hand, and the mayor and school committee, on the other hand, under collective bargaining agreements. At issue generally is the extent of the obligation of the city to hire per diem substitute teachers (substitute teachers) to replace regular teachers who are absent. Specifically, the parties disagree as to the lawfulness of an arbitrator's award which directed payment of damages to the union's scholarship fund because the school committee failed to hire substitute teachers during certain school days in December, 1972. Although there are various parties to these proceedings (as fully described in nn.1, 2, and 3), in practical terms the contest is between the union and the city, and we shall refer to the parties generally as the union and the city.

We conclude that (1) class size, teaching load, and the number of substitute teachers to be hired are proper subjects of collective bargaining; (2) the obligation to hire substitute teachers in December, 1972, was enforceable in the circumstances; (3) the city may decline to hire substitute teachers when no appropriated funds are available for the purpose, but (4) on this record, during the significant days in December, 1972, there were sufficient available funds to hire substitute teachers and, (5) the arbitrator exceeded his powers in directing the payment of damages to the union's scholarship fund. We regard this as an appropriate occasion to declare for the future the duties of the city, the school committee, and the mayor concerning the funding of obligations arising from collective bargaining agreements. Therefore, we declare that the mayor does not have the power to veto the appropriation of funds to meet collective bargaining obligations when the amount of

the needed funds exceeds the amount which, pursuant to special legislation applicable to Boston, the school committee is authorized to appropriate on its own.

## The Facts.

On December 6, 1972, the mayor notified the school committee by letter that he was instructing the city auditor to take certain steps, including an immediate termination of payment for substitute teachers for the balance of the calendar year. In his letter, the mayor asserted that the school committee had "been spending at a rate which, if unchecked, will result in a $1.4 million deficit in 1972." On December 8, 1972, the school committee instructed the superintendent of schools to discontinue hiring substitute teachers to cover the classes of absent regularly assigned teachers, and no substitute teachers were hired during the nine school days from December 11, 1972, to the commencement of Christmas vacation.

All collective bargaining agreements entered into between the union and the school committee have contained the statement: "It is the policy of the Committee that substitutes shall be hired to cover classes of regularly assigned teachers when they are absent." The collective bargaining agreement in effect in December, 1972, also provided for maximum limits on class size and a maximum number of teaching periods for each Boston teacher. The discontinuance of the hiring of substitute teachers caused class sizes and teaching loads to exceed these limits.

On December 12, 1972, the union filed a grievance pursuant to the collective bargaining agreement protesting the failure of the school committee to hire substitute teachers, and requested arbitration. That same day, the school committee responded to the grievance by voting that it agreed with the union that there had been "violations of the contract in the matter of the lack of substitutes to cover classes." The school committee also agreed to binding arbitration but claimed to have "no control over the violations." The grievance was submitted to arbitration on December 13, 1972.

On that same day, the union commenced one of the two cases which are now before us. The union sought preliminary and permanent injunctions, in effect, directing that substitute teachers be hired to cover classes of regularly assigned teachers when they were absent. The union also sought a declaration of the obligations of the school committee to hire substitute teachers to cover the classes of absent regularly assigned teachers. The application for preliminary injunctive relief was denied.

The total appropriation for general school purposes in 1972 was approximately $101,130,000, of which all but $10,-000,000 was appropriated by the school committee pursuant to its statutory authority. On December 11, 1972, the amount of appropriated funds ostensibly remaining in the account designated "Salaries, Professional (Temporary)," from which salaries of substitute teachers normally would be paid, exceeded the amount which would be needed, on any reasonable estimate, to meet the cost of hiring substitute teachers during the balance of the calendar year. The record does not show on what date the school committee committed all of the funds appropriated for general school purposes. It does show that in 1972 the school committee expended for general school purposes approximately $1,300,000 more than was appropriated for those purposes.

The hearings on the union's arbitration demand were held in January and February, 1973, and the arbitrator filed an opinion and award on March 22, 1973. He ordered the school committee "and/or" the city to pay $52,416 to the Boston Teachers Union Scholarship Fund "as damages for the several and repeated violations of the [collective bargaining agreement] during the last nine school days of calendar 1972 in respect of the failure to hire daily substitutes." He also directed that the school committee should not "hereafter unilaterally discontinue the hiring of daily substitutes during the term of the existing Agreement."

On April 13, 1973, the school committee, the mayor, the city, the city auditor, and the city treasurer commenced

the second case which is now before us, a "petition for declaratory judgment and for vacation of arbitration award." The city alleged that the arbitrator exceeded his authority under the collective bargaining agreement in undertaking to determine the obligation of the city to provide funds for substitute teachers, in ordering the payment of funds to the union's scholarship fund, and in ordering payment of funds when no appropriation was available to pay substitute teachers from December 11, 1972, to the end of 1972. Specifically, the city sought an order that "lack of funds justified steps taken by the City of Boston and its Mayor and Auditor with respect to the hiring of substitutes." The union counterclaimed seeking confirmation of the award.

After the cases brought by the union and by the city were consolidated for trial, they were submitted in November, 1974, for decision on the pleadings and a stipulation of facts. The judge ruled in favor of the union, confirming the arbitrator's award. He also ordered entry of judgments declaring the rights of the parties concerning the hiring of substitute teachers in terms which were consistent with the union's contentions and the arbitrator's award. The terms of the judgments entered in these proceedings are discussed more fully below.

The city appealed from the judgments, and we granted the union's request for direct appellate review.

### *The Scope of Collective Bargaining.*

The city argues first that the failure to hire substitute teachers for economic reasons and the consequences of the failure to hire substitute teachers are not proper subjects of collective bargaining and that, therefore, the terms of the collective bargaining agreement concerning substitute teachers cannot be enforced. It claims that these subjects are exclusive areas of managerial prerogative, relying on the conclusions expressed in our recent opinions in *School Comm. of Braintree* v. *Raymond,* 369 Mass. 686 (1976), and *School Comm. of Hanover* v. *Curry,* 369 Mass. 683 (1976). The city says that under G. L. c. 149, § 178I, ap-

plicable in 1972 but repealed as of July 1, 1974, by St. 1973, c. 1078, §§ 1 and 7, and under G. L. c. 150E, § 6, inserted by St. 1973, c. 1078, § 2, now in effect, the hiring of substitute teachers does not involve a "condition of employment" and is not arbitrable. See *Director of the Div. of Employee Relations of the Dept. of Administration & Fin. v. Labor Relations Comm'n, ante,* 162, 166-167 (1976), where we did not have to reach the question whether a hiring freeze, said to be the result of financial stringency, was intrinsically nonarbitrable.

Obviously, the conditions of employment of school teachers and subjects within the prerogative of a school committee are not mutually exclusive. See Edwards, The Emerging Duty to Bargain in The Public Sector, 71 Mich. L. Rev. 885, 919-920 (1973). These conflicting interests, in the context of collective bargaining, have been the subject of litigation in other jurisdictions with differing results. See Annot., 68 A.L.R.3d 885, 921-926, 928-938 (1976). These differing results may be explained, in part, by variations in the statutory provisions concerning the collective bargaining rights and duties of public employees and public employers from jurisdiction to jurisdiction. Some cases have excluded class size and teaching load from collective bargaining without any significant analysis of whether a school committee's powers are being undermined when, by mutual consent, such items are included in the collective bargaining agreement. See *Biddeford v. Biddeford Teachers Ass'n,* 304 A.2d 387, 403, especially 420 (Me. 1973) (Wernick, J., separate opinion); *School Dist. of Seward Educ. Ass'n v. School Dist. of Seward,* 188 Neb. 772, 784 (1972); *Aberdeen Educ. Ass'n v. Aberdeen Bd. of Educ.,* 215 N.W.2d 837, 841 (S.D. 1974). Some decisions have restricted the rights of teachers to bargain concerning class size or working load, by accepting an agency determination of the scope of the statutes administered by that agency or by relying on the legislative history of the applicable statute. *National Educ. Ass'n of Shawnee Mission, Inc. v. Board of Educ. of Shawnee Mission Unified School Dist. No. 512,* 212 Kan. 741, 751-753 (legislative history

showed that class size and the use of substitute teachers did not fall within the statutory phrase "terms and conditions of professional service"). *West Irondequoit Teachers Ass'n v. Helsby*, 35 N.Y.2d 46, 51 (1974) (agency determination that class size does not involve "terms or conditions of employment" upheld as not an unreasonable construction of the statute). *Pennsylvania Labor Relations Bd. v. State College Area School Dist.*, 9 Pa. Commonwealth Ct. Rep. 229, 242, 245-247 (1973) (labor board is correct in ruling that class size and teaching load involve "matters of inherent managerial policy" which by statute public employers are required to meet and discuss but as to which public employers are not required to bargain), remanded, 461 Pa. 494 (1975). The scope of collective bargaining may be found in a statutory statement of matters which may or may not be the subject of mandatory bargaining. See *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n*, 64 N.J. 17, 30-31 (1973); *Pennsylvania Labor Relations Bd. v. State College Area School Dist.*, 461 Pa. 494, 502-503 (1975). Here, however, we have neither an interpretation by an administrative agency nor a statutory specification of bargainable subjects. Other courts have construed applicable statutes as requiring bargaining and permitting binding agreements concerning class size and work load. *West Hartford Educ. Ass'n v. DeCourcy*, 162 Conn. 566, 585-586 (1972) (class size and teaching load are "condition[s] of employment"). *Clark County School Dist. v. Local Gov't Employee Management Relations Bd.*, 90 Nev. 442, 446-447 (1974) (agency construction of statute accepted that class size and teaching load are negotiable).

We conclude that the provision for the hiring of substitute teachers was a proper subject of collective bargaining and that, in these circumstances, the enforcement of the terms of the collective bargaining agreement would not intrude improperly into an area reserved for the judgment of the school committee concerning educational policy. We start with the belief that the size of a class and required hours of teaching are "conditions of employment" and are proper subjects of a collective bargaining agreement under

G. L. c. 150E. We believe further that the manner in which a school committee's agreement concerning class size and teaching load will be carried out may be the subject of collective bargaining,[4] and, if a school committee makes an agreement as to how class size and teaching load will be maintained, that agreement may be enforced if enforcement will neither infringe on the school committee's prerogative to determine policy nor contravene statutory limitations.

The city and the union agreed that the mandated class size and teaching burden would be assured by providing substitute teachers to serve when regular teachers were absent. In this respect, the school committee established an educational policy. Even assuming, but not deciding, that the school committee had the right during the term of the agreement to change its view of proper class size and teaching load and of the use of substitute teachers as matters of educational policy, and thus to ignore its agreement on these subjects, the facts here show that no change of educational policy was involved. The school committee reluctantly acceded to the financial strictures imposed by the mayor and ceased hiring substitutes for the balance of the calendar year. However, it did not change its view as to proper class size or teaching load, nor did it determine that substitute teachers were unnecessary or unwanted as a matter of educational policy. Thus, unlike the situation in *School Comm. of Braintree* v. *Raymond,* 369 Mass. 686 (1976), the school committee's judgment not to hire a particular person did not deal with any question of its managerial prerogative or educational policy. In this circumstance, the terms of the collective bargaining agreement by which class size and teaching load would be maintained were enforceable. Indeed, the established educational policy concerning class size and teaching burden would be reinforced, rather than weakened, by continuing to provide substitutes. Neither the arbitrator in making

---

[4] In *Reilly* v. *School Comm. of Boston,* 362 Mass. 689, 693 (1972), we said, in a somewhat different context, that "the question of substitutes ... will continue to be a legitimate subject of bargaining ...."

his award nor the judge in ordering that substitute teachers be hired as provided in the collective bargaining agreement contradicted the school committee's exercise of its exclusive managerial judgment or of its right to make educational policy determinations.

What we decide in this case should not be construed as a requirement that, in the course of collective bargaining, a school committee must reach an agreement on class size, teaching load, or the use of substitute teachers. A school committee is entitled to maintain its own position on these subjects as matters of fiscal management and educational policy. When, however, an agreement is made on these subjects consistent with the committee's view of fiscal management and educational policy, the terms of that agreement may be enforced where there has been no change in educational policy and funds are available to implement the terms of the agreement.[5]

### The Availability of Funds.

The city argues next that the arbitrator exceeded his authority in ordering the city to make a payment when no funds for the hiring of substitute teachers were available during the school days involved here. Chapter 150C, § 11 (*a*) (3), provides that the judge shall vacate an award if the arbitrator exceeded his powers or rendered an award requiring a person to commit an act prohibited by State law.

The city's argument assumes, we think correctly, that (1) the award was valid only if appropriated, uncom-

---

[5] The Legislature can remove considerable uncertainty concerning which subjects are proper matters for collective bargaining between teachers and school committees. It might define those subjects which can or cannot be incorporated in a binding collective bargaining agreement. It might state that, to the extent certain matters are made a part of a collective bargaining agreement, the school committee has lost its prerogative during the term of the bargaining agreement to exercise its otherwise exclusive control over matters of educational policy, except perhaps in certain circumstances. In the absence of further statutory definition, the subject of the scope of permissible, binding collective bargaining and the enforceability of such agreements will have to be dealt with on a case by case basis.

mitted funds in the school budget established according to law were available for the hiring of substitute teachers at the times the school committee refused to hire substitute teachers (*Dyer* v. *Boston,* 272 Mass. 265, 274-275 [1930]; *McHenry* v. *Lawrence,* 295 Mass. 119, 122-123 [1936]; cf. *Arthur R. Murphy, AIA, & Associates, Inc.* v. *Brockton,* 364 Mass. 377, 379-380 [1973]) and (2) the question of the availability of funds was an issue which could not be determined conclusively by the arbitrator and, therefore, was open in the Superior Court when the question of confirmation of the arbitration award was presented (*Marlborough* v. *Cybulski, Ohnemus & Associates, Inc., ante,* 157, 160-161 [1976]). The question then is whether uncommitted funds were available on those days when substitute teachers were to be hired pursuant to the terms of the agreement but were not hired.

The judge was warranted in finding that uncommitted funds were available on the school days in December, 1972, when substitute teachers might have been hired. The balance remaining in the classification in the school department budget from which temporary teachers' salaries would be paid was more than sufficient to provide the necessary funds to pay substitute teachers through the end of 1972. The city points out, however, that this fact does not answer the question. It argues correctly that the school committee is not restricted by the amounts appropriated to its various budget classifications, that generally the school committee may use its uncommitted funds for any proper purpose,[6] and that, in this case, it had done so to the point of depleting its entire appropriation. Thus, the argument goes, because all funds appropriated for general school purposes already had been expended or committed by De-

---

[6] *Collins* v. *Boston,* 338 Mass. 704, 707-709 (1959). See *Reilly* v. *School Comm. of Boston,* 362 Mass. 689, 694 (1972). Cf. *Fitchburg Teachers Ass'n* v. *School Comm. of Fitchburg,* 360 Mass. 105, 108-109 (1971), where the depletion of one item in a school budget was held not to be conclusive as to the plaintiffs' rights and the case was remanded for a determination whether there were sufficient unexpended funds in the total appropriation for school purposes.

cember 11, 1972, the award was unlawful.[7] The city argues that there is no basis on this record for finding that there were uncommitted funds available to pay substitute teachers on any of the school days involved here.

Although the burden of proving the availability of funds is on the person seeking to recover from a municipality (*Anchor Steel Co.* v. *Granville,* 318 Mass. 688, 691 [1945]), we think that burden has been met on this record. When the issue came before the Superior Court, the arbitrator already had found that funds were available. The city was opposing the confirmation of the arbitrator's award. In such a situation, if the arbitrator has found that funds were available and if the evidence before the court shows that there were sufficient funds available in the budget classification from which payment should be made, the city has the burden of going forward to show that the funds apparently available had been expended or committed previously by the school committee. See *Epstein* v. *Boston Housing Authority,* 317 Mass. 297, 302 (1944), concerning the burden of going forward with evidence. In these circumstances, it would be unfair to place any greater burden of producing evidence of the availability of funds on a person seeking to recover an arbitration award against a municipality. The city's burden of going forward was not met by evidence that the school committee expended approximately $1,300,000 more in 1972 than was appropriated for general school purposes because it does not show that no funds were available on the school days involved here.

### *The Scope of the Arbitrator's Authority.*

The city contends that the arbitrator exceeded his powers in rendering his award. The city's fundamental contention is that an award of $52,416 to the union's scholarship

---

[7] The arbitrator made a finding that funds were available to pay substitute teachers, but seems to have based his conclusion solely on the balance in the account designated "Salaries, Professional (Temporary)" without considering whether the union had established the availability of uncommitted funds appropriated generally for school purposes.

fund was not lawful.[8] The question whether the arbitrator exceeded the scope of his powers always is open for judicial review. See *Trustees of the Boston & Me. Corp.* v. *Massachusetts Bay Transp. Authority,* 363 Mass. 386, 390 (1973).

We think that the arbitrator's direction that public funds should be paid to a union scholarship fund exceeded his powers. We have held that an arbitrator has no authority to make a binding determination that a municipality incurred an obligation in an amount in excess of the amounts lawfully appropriated for the particular purpose. See *Marlborough* v. *Cybulski, Ohnemus & Associates, Inc., ante,* 157, 160-161 (1976). By the same token, an arbitrator has no power to make an award which requires a municipality to pay funds for a purpose for which municipal funds may not be expended. Although the record is silent on the nature and purposes of the union's scholarship fund, no argument is advanced that the city lawfully could appropriate funds for that fund. Such an award in an arbitration proceeding involving a municipal employer must be vacated as in excess of the arbitrator's power.

We do not suggest that no award could be made in these circumstances. "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations." *United Steelworkers of America* v. *Enterprise Wheel &*

---

[8] The city also argues that the arbitrator had no authority to order the payment of funds because a "grievance" as defined in the collective bargaining agreement excluded "any matter as to which the Committee is without authority to act." The city argues that the school committee had no choice as a result of the mayor's determination to cut off funds for substitute teachers. As we have seen, however, funds were available to pay substitute teachers. The mayor's determination to refuse to pay substitute teachers because of an incipient deficit could not justify the refusal of the school committee to hire substitute teachers. Of course, if there had been no uncommitted funds in the school committee budget to pay substitute teachers, the situation would have been different.

*Car Corp.*, 363 U.S. 593, 597 (1960). See *United Elec. Radio & Mach. Workers of America* v. *Honeywell, Inc.*, 522 F.2d 1221, 1226 (7th Cir. 1975). The problem here is that damages were awarded for a purpose for which public funds could not be expended. The award did not give relief to the teachers who were overworked or overburdened.

The record does not show that the teachers who were the victims of the school committee's failure to hire substitutes could not be determined.[9] The agreement concerning substitutes was for the benefit of the regular teachers so that class size and teaching load provisions of the collective bargaining agreement could be complied with. Some method of compensation for those teachers who were aggrieved by the school committee's failure to hire substitutes would be within the arbitrator's power, and that method need not be defined with precision in order to be free from successful challenge under G. L. c. 150C. We express no opinion, however, on whether the arbitrator might be able to make a lawful award of damages if the aggrieved teachers cannot be ascertained.

The arbitrator's award must be vacated. Arbitration proceedings may be resumed at the request of the union on the question of the nature of any award of damages which would be appropriate in the circumstances.

## Declaratory Relief.

We come finally to the question of the extent, if any, to which declaratory relief should have been granted by the court below. The city argues that, because the contract year had expired long before the judgment was entered and because the provisions of the General Laws concern-

---

[9] Although the judge found and ruled that it was "impossible to determine damages to the individual teachers," the case is here on an agreement as to all the facts, and we are not bound by his conclusions. *Richardson* v. *Lee Realty Corp.*, 364 Mass. 632, 634 (1974), and cases cited.

ing municipal collective bargaining have been changed since 1972, no declaratory relief should have been ordered concerning the obligations of the school committee and the mayor. The union urges that we discuss the roles of the mayor and the school committee concerning the funding of obligations contained in collective bargaining agreements between the school committee and the union. We agree that, because the terms of the collective bargaining agreement concerning substitute teachers have been continued from year to year, this is an appropriate occasion to pass on the future duties of the mayor and the school committee in connection with the possible funding of a commitment made to hire substitute teachers.

However, no declaratory relief concerning the city's future obligations should have been granted in the case commenced by the city to vacate the arbitration award. The union requested no declaratory relief in that case. The city properly asked for a determination that no funds were available, in effect raising an affirmative objection to confirmation of the arbitrator's award. A declaration that funds were available to satisfy the award, thus rejecting the city's contention, would have been proper, but the confirmation of the award impliedly served the same purpose. Nevertheless, the judgment contained an order that the school committee should not "unilaterally discontinue the hiring of substitutes to cover classes of regularly assigned teachers when they are absent so long as such a requirement is contained in the collective bargaining agreement" between the school committee and the union. This order is too broad because it makes no reference to the requirement that funds be available for the purpose of paying substitute teachers.

In the proceeding brought by the union seeking an order that substitute teachers be hired, the union sought a declaration that the school committee had a duty to hire per diem substitutes to cover classes of regularly assigned teachers when they are absent. Here the judgment contained several declarations, which are set forth in full in

the margin,[10] concerning the duty of the mayor, the school committee, and others.

We agree that the terms of the collective bargaining agreement obligate the school committee to hire substitute teachers. See paragraph A in n.10. We agree further that the school committee may make a conditional agreement requiring the expenditure of funds in excess of the appropriations available to it; that, if the school committee makes a timely request for additional funds, the mayor must submit that request to the city council for its action (see G. L. c. 150E, § 7, discussed below); and that, if the appropriation is approved, the terms of the agreement then become binding on the school committee, subject to the exercise of its nondelegable rights. See paragraph B in

---

[10] The judgment stated:

"It is Ordered and Adjudged

"[A] The School Committee of the City of Boston is obligated in accordance with the terms of the collective bargaining agreement between that Committee and the Boston Teachers' Union, Local 66, American Federation of Teachers, A.F.L.-C.I.O., to hire substitute teachers to cover classes of regularly assigned teachers when they are absent.

"[B] The School Committee of the City of Boston can enter binding contracts with the Boston Teachers' Union, Local 66, American Federation of Teachers, A.F.L.-C.I.O. in excess of the appropriations available to it; and, in that event, the Mayor of the City of Boston is required to submit a sufficient appropriation to the Boston City Council, for that Council's approval or rejection, so that, if approved, that appropriation will provide the funds necessary to implement the cost items in the provisions in the contracts entered into between the School Committee of the City of Boston and the Boston Teachers' Union.

"[C] When the Mayor of the City of Boston fails to submit a sufficient appropriation to the Boston City Council to implement the cost items in the provisions in the contracts entered into between the School Committee of the City of Boston and the Boston Teachers' Union, the funds necessary to implement the provisions in said contracts may be expended by that School Committee in excess of the appropriations available to said Committee.

"[D] The School Committee of the City of Boston and its members, the City of Boston and its Mayor and Auditor, and the officers, employees and agents of any of them, are permanently enjoined from in any way interfering with, preventing and/or impairing the hiring and payment of substitute teachers to cover classes of regularly assigned teachers when they are absent, unless the provisions of G. L. c. 149, § 178I, are complied with in periods prior to July 1, 1974, and the provisions of G. L. c. 150E § 7 are complied with beginning July 1, 1974."

n.10.[11] If, however, the mayor does not submit a request to the city council, the judgment is in error in stating that funds may be expended by the school committee in disregard of the amount of appropriated funds. See paragraph C in n.10. The solution is a suit to compel the mayor to make such a submission. Cf. *Mendes* v. *Taunton,* 366 Mass. 109, 118 (1974); *Callahan* v. *Woburn,* 306 Mass. 265, 277 (1940).

The last paragraph of the judgment (see paragraph D in n.10) presents too broad and indefinite an order. It enjoins the city, the mayor, the school committee, the auditor, and all city employees from interfering with the hiring of substitute teachers unless the provisions of two statutes, one repealed (G. L. c. 149, § 178I) and the other now in effect (G. L. c. 150E, § 7), are complied with. These statutes are not uncontrovertibly clear. Considerable litigation has resulted from disputes as to their meaning.[12] We think it is unfair to subject the named and unnamed persons to the risk of contempt of court because of a failure to comply with the requirements of such statutes. Any order concerning the duties of the city, the mayor, the school committee, and others should be more explicit, if such an order is to be entered. Our practice is not to order public officials to act when their duties have been defined by a court decree, because we assume that public officials will act in conformity with the court's determination of their obligations.

The city argues strenuously that we should not require the mayor to submit school committee requests for additional appropriations to the city council because, pursuant to legislation specially applicable to Boston, the mayor has the power to restrict appropriations for school purposes if

---

[11] The contract is in no sense "binding" when made if necessary funds are unavailable. Also, the mayor has no obligation to request an appropriation until asked to do so by the school committee.

[12] See, e.g., *Labor Relations Comm'n* v. *Natick,* 369 Mass. 431, 432 (1976); *Mendes* v. *Taunton,* 366 Mass. 109, 114 (1974); *Kerrigan* v. *Boston,* 361 Mass. 24 (1972); *Fitchburg Teachers Ass'n* v. *School Comm. of Fitchburg,* 360 Mass. 105 (1971).

the total amount requested exceeds a defined statutory amount. In *Pirrone* v. *Boston*, 364 Mass. 403 (1973), we discussed the relative rights and duties of the school committee, the mayor, and the city council in Boston. We pointed out that the school committee is empowered to appropriate funds annually for school purposes up to a certain limit — "essentially, an amount equal to the amount of funds which was required to finance the school system in the preceding year, plus an additional amount to provide for salary increases which became effective during that preceding year." *Id.* at 409. We said that, "[if] the school committee determines that additional funds are necessary, it must resort to the usual municipal finance system and request an appropriation by the city council . . . ." *Ibid.* We added, however, that under St. 1909, c. 486, § 3, submission of such a request for an appropriation was subject to the mayor's control because he could decline to make such a submission. In the *Pirrone* case, we did not discuss the consequences of a request for additional funds which were needed to finance obligations resulting from a collective bargaining agreement between the school committee and a union representing teachers. The city argues that the peculiar authority of the mayor with respect to school department appropriations must be respected as prevailing over any requirement of the General Laws that funding of the obligations of a collective bargaining agreement must be submitted seasonably for action by a municipality's appropriating body.

We recognize that, absent a contrary legislative intent, the provisions of a special act relating to a subject normally will prevail over conflicting provisions of a subsequently enacted general law. See *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 698 (1971), and cases cited. We turn then to an analysis of the provisions of G. L. c. 150E, concerning the bargaining rights of public employees, to determine the obligations of municipalities and their representatives.

Chapter 150E is a comprehensive Statewide statutory revision concerning the collective bargaining rights of pub-

lic employees. Section 1 of G. L. c. 150E states that the "employer" in a city is the city itself, generally acting through its chief executive officer or designated representative. However, "[i]n the case of school employees, the municipal employer shall be represented by the school committee" or its designee. The city remains the employer, but its representative is the school committee (or its designee). Section 7 requires the employer to "submit to the appropriate legislative body within thirty days after the date on which the agreement is executed by the parties, a request for an appropriation necessary to fund the cost items contained therein . . . ." If the request for an appropriation is rejected, such cost items must be returned to the parties for further bargaining.[13] The words "legislative body" are defined as the city council where the "employer" is a city. G. L. c. 150E, § 1.

The employer who must submit the request for funds is the city, and, in the case of Boston, the mayor is the person who (on notice and request from the school committee) must act for the city in placing the question of an appropriation before the city council. Although the mayor has no direct appropriating function, by special act he does have a veto over any appropriation for school department funds in excess of a particular amount, determined annually.

The record here does not show that the amount necessary to meet the requirements of collective bargaining agreements has exceeded or will exceed that limit. If the amount necessary to meet the funding needs of collective bargaining agreements does not exceed the amount which the school committee may appropriate on its own, no conflict will exist between the General Laws and the stated powers of the mayor pursuant to special act. In such a case, the mayor would retain his absolute veto as to amounts re-

---

[13] Section 7 also provides that where G. L. c. 71, § 34, applies (which is not the case in Boston), these funding provisions and the provision for further bargaining are not applicable. In a municipality subject to G. L. c. 71, § 34, the school committee's right to obtain necessary funds on request are far broader.

quested in excess of the school committee's appropriation authority.

If the amount needed to meet the requirements of collective bargaining agreements exceeds the amount which the school committee may appropriate on its own, we think that the mayor must nevertheless transmit the school committee's request to the city council. The mayor is not an "appropriate legislative body" to whom G. L. c. 150E, § 7, intends that a request for appropriations must be submitted for action. Chapter 150E gives a mayor no bargaining function in negotiating with school employees, nor, as we have said, does it give him an appropriating function. If a mayor were to have absolute control over requests for appropriations to meet the requirements of a negotiated agreement, we think the Legislature would have given him a role in the bargaining process. Therefore, the provisions of G. L. c. 150E reveal a strong legislative intent that the question of appropriating funds to meet the needs of a collective bargaining agreement should be submitted to the municipal body whose action is required to appropriate the necessary funds. We believe that the provisions of Boston's special act must be construed to conform with the intent of G. L. c. 150E. See *McDonald* v. *Superior Court,* 299 Mass. 321, 324 (1938).[14]

The result we reach preserves as much of the mayor's power of veto over school department appropriations as is possible without thwarting the legislative intent of G. L. c. 150E that a school committee's request for appropriations be submitted to the appropriate legislative body. The

---

[14] An area of uncertainty is the proper treatment of a school committee request for the funding of an obligation in a collective bargaining agreement which cannot be determined precisely at the commencement of the term of the agreement (such as the amount necessary to pay substitute teachers). Section 7 of G. L. c. 150E provides for the submission of a request for an appropriation within thirty days of the execution of the agreement. Chapter 150E does not provide explicitly for consideration of requests for the funding of collective bargaining obligations after that date. We express no opinion on the extent of the mayor's duty, if any, to submit a request for an additional appropriation to fund an obligation of a collective bargaining agreement after he has complied with his initial duty to make such a submission.

mayor, of course, may recommend disapproval of the request. He may decline to submit school committee requests for amounts not related to the funding requirements of collective bargaining agreements, and, as a practical matter, the school committee may not be able to ignore his views on subjects of collective bargaining because of the mayor's absolute control concerning other budget items as to which the school committee must request additional appropriations.

## Conclusion.

In the action brought by the city, judgment shall be entered vacating the arbitrator's award and directing that, on request of the union, further arbitration proceedings may be held.

In the action brought by the union, a judgment shall be entered in conformity with this opinion. In order to facilitate the entry of such a judgment, we direct that the action brought by the union (*Boston Teachers Union, Local 66, American Federation of Teachers [AFL-CIO]* v. *School Committee of Boston*, Suffolk Superior Court No. 96399 Eq.) be transferred to the Supreme Judicial Court for the county of Suffolk so that the form of that judgment may be approved by a single justice of this court.

*So ordered.*