BOSTON TEACHERS UNION, LOCAL 66[1] *vs*. MAYOR OF BOSTON
& others.[2]

Suffolk.   April 7, 1983. — July 22, 1983.

Present: HALE, C.J., KASS, & WARNER, JJ.

*Boston.   School and School Committee,* Collective bargaining contract,
Salaries of employees, Budget.  *Municipal Corporations,* Municipal
finance, Collective bargaining.

The mayor of Boston was not required, pursuant to the Supreme Judicial
Court's decision in *Boston Teachers Local 66* v. *School Comm. of
Boston,* 386 Mass. 197 (1982), to submit to the city council the school
committee's original request for a supplemental appropriation that in-
cluded $19.8 million to fund the third year of an executed collective
bargaining contract where the school committee had withdrawn that
request and had submitted a revised request for $13 million, based
upon the city's assumption of $6.8 million in nonsalary costs otherwise
chargeable to the school committee's budget. [385-387]

CIVIL ACTION commenced in the Superior Court Depart-
ment on August 25, 1981.

After review by the Supreme Judicial Court reported in
386 Mass. 197 (1982), the case was heard by *Garrity,* J.

*James T. Grady* for Boston Teachers Union, Local 66.

*Matthew E. Dwyer* for Boston Public School Building
Custodians' Association, intervener.

*Richard W. Coleman* for Boston Association of School
Administrators and Supervisors, intervener.

---

[1] Upon motion, the Boston Public School Building Custodians' Associa-
tion and the Boston Association of School Administrators and Supervisors
(BASAS) were allowed to intervene as parties-plaintiff.

[2] Upon motion of the plaintiffs, the city council of Boston was added as
a party-defendant.  Upon its own motion, the school committee of Boston
was allowed to intervene as party-defendant.

*Eric J. Nadworny,* Assistant Corporation Counsel, for the Mayor of Boston & another.

*Michael J. Betcher,* Special Assistant Corporation Counsel *(Mary Jo Hollender,* Special Assistant Corporation Counsel, with him) for School Committee of Boston.

KASS, J.  At issue is whether, after *Boston Teachers Local 66* v. *School Comm. of Boston,* 386 Mass. 197 (1982) (*BTU III*), the school committee of Boston, in response to blandishments by the mayor, could withdraw a supplemental appropriation request and substitute one for $6,800,000 less.  From a judgment entered in the Superior Court which, in effect, permitted the school committee so to do, the plaintiff unions appeal.  In naming the mayor as the primary defendant, the unions identify the mayor as the active agent in the reduction of the committee's financial request and, thus, the villain of the drama.  We affirm.

Following the court's order in *BTU III,* the school committee, on May 28, 1982, submitted to the mayor a supplementary budget proposal totaling $35,200,000.  Of that sum, $19,861,526 was required for fiscal year 1983 to fund the third and final year of the executed collective bargaining agreements which were the subject of *BTU III.*

It had been decided in *Boston Teachers Local 66* v. *Boston,* 382 Mass. 553, 558-560 (1981) (*BTU II*), that the mayor has a statutory obligation under G. L. c. 150E, § 7(*b*), as amended through St. 1980, c. 354, § 17A, to submit to the city council, within thirty days after a collective bargaining agreement is executed, a request for the supplemental[3] appropriation necessary to fund that agreement. In that regard the mayor acts as the chief executive officer of the "employer" referred to in § 7(*b*).  *Id.* at 559.  His function as the transfer agent to the city council of the appropriation request is ministerial, and he is not to bargain about the numbers.  *Id.* at 560.

---

[3] That is, above what the school committee had statutory authority to appropriate on its own account.  See St. 1936, c. 224, §§ 2 and 3, as amended, and *Pirrone* v. *Boston,* 364 Mass. 403, 406-410 (1973).

When, as here, supplemental appropriations for subsequent fiscal years covered by a contract are involved, the statutory language of § 7(*b*) is an imperfect fit. Obviously much more than thirty days will have elapsed since the date the collective bargaining agreement was executed. The statutory anomaly, however, is only a surface one, and the court has read § 7(*b*) as contemplating appropriations "as a matter of course in the succeeding years of the contract," *BTU III*, 386 Mass. at 204, and that, as in the first year of an agreement, the mayor's role is ministerial. *BTU III*, 386 Mass. at 210. If thirty days is the right time within which to perform the ministerial act of transmitting a request to the city council in the first year, we may assume thirty days is a reasonable yardstick for transmitting requests for appropriations for subsequent years in the ordinary circumstances where the school committee's request is unqualified. Here, before thirty days had run other than ordinary circumstances pertained and the school committee's request had become qualified.

Upon receipt of the school committee's request of May 28, 1982, the mayor once again balked. He refused to submit the request to the city council and raised many of the arguments expressly rejected in *BTU II*. See particularly *BTU II*, 382 Mass. at 555 n.3, in which the questions raised in that case are summarized. The plaintiffs moved for, and obtained from, a judge of the Superior Court injunctive relief on June 22, 1982, ordering the mayor, among other things, to transmit to the city council the school committee's May 28 request for $19,861,526 to fund the third year increments which had been negotiated with the three unions which are the plaintiffs in this case.

During argument of a petition by the city under G. L. c. 231, § 118, to a single justice of the Appeals Court to vacate the Superior Court injunction, counsel for the school committee represented that the request for $19,861,526 for the third year increments might be excessive (and, it would follow, might be revised) if the city council were to vote appropriations for $9,650,000 in second year increments re-

quired by the union contracts. The single justice, on the strength of that representation, denied relief (by an order dated June 25, 1982) as to so much of the injunction as dealt with second year increments, but vacated the final paragraph, which dealt with the third year increments. At that juncture, i.e., before thirty days from the school committee's appropriation request had gone by, it was known to the court that the school committee might revise its request for money to fund the collective bargaining agreements. While the parties conducted these maneuvers, significant legislation bearing on the city's fiscal structure was making its way through the Legislature. That legislation, St. 1982, c. 190, bearing the title "The City of Boston Funding Loan Act of 1982" and more familiarly known as the "Tregor bill," was approved by the Governor of the Commonwealth on June 29, 1982.[4] Examination of the Senate calendar discloses that the Boston Funding Loan Act of 1982 had been the subject of intense activity beginning with June 23, 1982, on which day it had been favorably reported to the Senate by the Committee on Ways and Means. In combination, the school committee's suggestion that it would require less money than was first asked and the pendency of the city of Boston funding loan legislation served to create circumstances where rigid adherence to a thirty-day requirement for transfer of the original appropriation request was unreasonable.

On August 17, 1982, i.e., approximately eleven weeks after its initial request for appropriations, the school committee, by letter from the superintendent of schools, expressly revoked the item of $19,861,526 to fund the third year of the collective bargaining agreement. "[B]ased on the City's assumption of $6.8 million in costs presently carried within the School budget," that letter said, "only $13.0 million additional is required to implement the FY '83 salary rates provided for in the . . . contracts. The School

---

[4] By § 50 of the act, it took effect upon its passage except for a section not here relevant.

Committee requests that you place before the City Council a supplemental appropriation in the amount of $13.0 million." The next day, August 18, 1982, the mayor transmitted to the city council the appropriation request for the $13,000,000.

Although the fiscal 1983 salary increments were now on the way to funding,[5] the plaintiffs pressed their action in the Superior Court. The reason for the unions' concern had nothing to do with the executed collective bargaining agreements, but had to do with the future. The intervening Boston Funding Loan Act of 1982 had altered the financial structure of the Boston school system established by St. 1936, c. 224. Under that statute, the ceiling of the school committee's power to appropriate independently, i.e., without the consent of the mayor and the city council, was the amount, inclusive of supplemental appropriations, required to operate the schools for the preceding fiscal year. See *Pirrone* v. *Boston*, 364 Mass. at 409. Under § 21 of the Boston Funding Loan Act of 1982, the city council and the mayor are empowered for fiscal years after 1982 to exclude supplemental appropriations from the school committee's independent appropriation authority, thus substantially enhancing the role of the city council and the mayor in the school budget process. St. 1982, c. 190, § 21.

Upon further proceedings a judge of the Superior Court entered a judgment on September 24, 1982, requiring the mayor to transmit the school committee's revised $13,000,000 supplemental appropriation request to the city council (which had already been done) and ordered the city to assume $6,800,000 of school costs carried by the school committee in its budget. The money required to cover the $19,800,000 (the remaining $61,526 was regarded as small change) needed for the collective bargaining contract was, thus, secured.

This appeal by the unions is from that judgment. They argue that the mayor was duty bound under *BTU III* to

---

[5] Briefs submitted on behalf of the school committee and the custodians' association imply that the city council approved the $13,000,000 request.

transmit the original $19,861,526 request. Instead, the unions charge, the mayor bargained about the school committee's request, contrary to the dictates of *BTU II* and *BTU III.* Had the mayor transmitted the first request at once, they reason, that appropriation would have been approved by the city council and would have been added to the school department's statutory base for future years, thus providing a better climate ($6,800,000 better) in which the unions could negotiate future collective bargaining agreements.[6]

Neither the mayor nor the school committee is so disingenuous as to suggest that the school committee reduced its supplementary appropriation request by $6,800,000 spontaneously. Considerable dickering had transpired in preceding weeks between the mayor and the superintendent of schools and their respective staffs. That is apparent from correspondence which appears in the record before us.

The rights of the unions in this matter are contractual in nature. *BTU III,* 386 Mass. at 210-211. It is a doubtful proposition, once the pay package of a collective bargaining agreement has been funded, as has occurred in this case, that the contractual bundle of rights for which the unions may press includes improving the economic environment for the next round of negotiations.

We do not understand the prohibition on the mayor's bargaining about supplementary appropriation requests to fund collective bargaining agreements, alluded to in *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 474 (1976) *(BTU I),* in *BTU II,* 382 Mass. at 560, and *BTU III,* 386 Mass. at 210, to proscribe as well any discussion with the school committee as to where the required money may be most expediently found. That would be unrealistic. It is the collective bargaining agreement itself, hammered out by the school committee, and the money re-

---

[6] The theory overlooks the possibility that the Boston Funding Loan Act of 1982, permitting exclusion of supplementary appropriations, might have intervened in any event before the city council acted.

quired to fund it, that the mayor is precluded from making the subject of negotiation by him. We are of opinion that the mayor's duty to transfer the appropriation request in a timely fashion must be interpreted in light of the considerable role he plays in connection with appropriations of other items within the school committee budget. Those other items appear to have been the subject of discussion between the mayor and the school committee in this case. Transmission of the school committee's request for funds to meet previously approved pay increases is ministerial, *BTU III*, 386 Mass. at 210, but the mayor's control over the remaining supplemental budget request is absolute. St. 1909, c. 486, § 3, as amended. *Pirrone* v. *Boston*, 364 Mass. 403, 409-410 (1973). *School Comm. of Boston* v. *Boston*, 383 Mass. 693, 698-699 (1981), *BTU III*, 386 Mass. at 200. Where, as here, the entire collective bargaining agreement has been funded, and only costs unrelated to the collective bargaining agreement were transferred to the city's budget, the interplay between "the school committee on the one hand and the mayor and city council on the other" reflects the "unique balance of responsibilities" the Legislature intended. *Pirrone* v *Boston*, 364 Mass. at 410. *School Comm. of Boston* v. *Boston*, 383 Mass. at 699. That balance is especially entitled to weight in light of the legislative action in connection with the Boston Funding Loan Act of 1982.

*Judgment affirmed.*