386 Mass. 197                                                    197

Boston Teachers Union, Local 66, v. School Committee of Boston.

Boston Teachers Union, Local 66, vs. School
Committee of Boston & another
(and two consolidated cases[1]).

Suffolk. January 7, 1982. — May 12, 1982.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & Lynch, JJ.

*Boston. School and School Committee,* Collective bargaining contract,
Termination of employment, Salaries of employees, Budget. *Municipal Corporations,* Municipal finance, Collective bargaining.

Where the first year of a three-year collective bargaining agreement between the teachers union and the school committee of the city of Boston was funded by the city council, the entire agreement was approved and a clause that provided for salary increases in the second and third years of the agreement was valid and enforceable, notwithstanding the provisions of St. 1909, c. 486; consequently, it was incumbent upon the mayor and the city council to provide in the annual budget of the city for an appropriation of funds necessary to pay the salary increases in the succeeding years of the contract. [203-211]

A no-layoff clause in a collective bargaining agreement between the teachers union and the school committee of the city of Boston was unenforceable against the committee as an intrusion into the area of its exclusive managerial prerogative under G. L. c. 71, § 37; however, to the extent that the school committee might voluntarily choose to enforce the clause, it may not compel the city council to appropriate money for that purpose. [211-214]

General Laws c. 71, § 42, does not require notice and a hearing when a tenured teacher is dismissed solely because of budgetary considerations. [214-216]

Civil actions commenced in the Superior Court Department on May 7, 1981, and May 8, 1981, respectively.

The cases were heard by *Morse,* J.

The Supreme Judicial Court granted a request for direct appellate review.

[1] School Committee of Boston *vs.* Boston Teachers Union, Local 66, & others. Boston Teachers Union, Local 66, & others *vs.* Mayor of Boston.

CIVIL ACTION commenced in the Superior Court Department on August 25, 1981.

Requests for injunctive relief were heard by *Morse*, J., and reported by him to the Appeals Court. The Supreme Judicial Court ordered direct review on its own initiative.

*James T. Grady* for Boston Teachers Union, Local 66.

*Matthew E. Dwyer*, for Boston Public School Building Custodians' Association, intervener.

*Richard W. Coleman & Paul F. Kelly*, for Boston Association of School Administrators and Supervisors, Local 6, AFL-CIO, intervener.

*Harold J. Carroll*, Corporation Counsel (*Marcia Seeler*, Special Assistant Corporation Counsel, with him) for the city of Boston, intervener.

*Allan W. Drachman* (*Philip Collins* with him) for School Committee of Boston.

*James F. Kavanaugh, Jr.* (*Chester A. Janiak* with him) for the City Council of Boston.

*Margot Botsford & S. Stephen Rosenfeld*, for Boston Teachers' Seniority Coalition, amicus curiae, submitted a brief.

HENNESSEY, C.J.  In these three cases, which have been consolidated at various stages of the proceedings, we must determine the rights and obligations of the parties in the second year of a collective bargaining agreement between the Boston Teachers Union, Local 66 (BTU), and the school committee of the city of Boston.  In the first case, the BTU has sought declaratory and injunctive relief to prevent the layoff of approximately 2,261 tenured teachers and permanently appointed nurses, on the ground that such lay-offs would violate the terms of a job security clause in the collective bargaining agreement.  The city of Boston was allowed to intervene in this action.  In the second action, the school committee of the city of Boston has sought a declaration of the obligations of the city council of Boston (city council), the mayor of the city of Boston (mayor), and the school committee, with respect to the funding and implementation

386 Mass. 197                                              199

Boston Teachers Union, Local 66, *v.* School Committee of Boston.

of the collective bargaining agreement.[2]  The BTU argues that these teachers are entitled to individual hearings pursuant to G. L. c. 71, § 42.  The Boston Police Patrolmen's Association moved to intervene as a party defendant, but no action was taken on the motion.  The American Federation of State, County and Municipal Employees Council 93, AFL-CIO, was allowed to participate as amicus curiae.  In the third action the BTU seeks declaratory and injunctive relief to compel the mayor to submit to the city council the school committee's request for an appropriation of $8.2 million to implement the salary increases for the second year of the collective bargaining agreement.[3]  Three parties have intervened in the last action — the school committee, the Boston Public School Building Custodians' Association and the Boston Association of School Administrators and Supervisors, Local 6.[4]  The latter two parties also entered into collective bargaining agreements with the school committee, and they seek to compel the mayor to submit requests to the city council for appropriations to fund the pay increases provided for by their respective agreements.  In all three actions, the trial judge generally denied the relief requested by the BTU.[5]

---

[2] The school committee also sought a declaration that it was entitled to appropriate, pursuant to St. 1936, c. 224, as amended, $205 million for general school purposes for fiscal year 1981-1982.  A judgment of the Superior Court was entered which, among other things, granted the relief sought by the school committee on this matter.  That part of the judgment has not been appealed.

[3] The BTU also requested an order enjoining the commissioner of assessing for the city of Boston from setting the tax rate of the city for fiscal year 1981-1982 until further order of the court.  The request was denied on the ground that the outcome of the litigation would not alter the tax rate in light of St. 1980, c. 580 ("Proposition 2 ½"), and that therefore no purpose would be served in granting the relief.  This decision was not appealed.

[4] The record does not indicate whether the motion of the Boston Association of School Administrators and Supervisors to intervene was allowed. However, since this does not affect the posture of the case, we treat the motion as allowed.

[5] In the third action the Superior Court judge reported the following question to the Appeals Court: "Does G. L. c. 150E, § 7, as amended,

We conclude that the salary increases provided for in the collective bargaining agreement are enforceable, and that the mayor and city council should appropriate money to pay for them. We also conclude, however, that the job security clause is unenforceable for periods exceeding one year, and further, that hearings pursuant to G. L. c. 71, § 42, are not required where dismissals are due to budgetary considerations.

Before relating the facts of the case, it is helpful to explain briefly the unique system by which the Boston public school system is financed. Statute 1936, c. 224, as amended, empowers the school committee to appropriate for general school purposes amounts up to a limit set by a statutory formula. "That limit is, essentially, an amount equal to the amount of funds which was required to finance the school system in the preceding year." *Pirrone* v. *Boston*, 364 Mass. 403, 409 (1973). See *School Comm. of Boston* v. *Boston*, 383 Mass. 693, 698 (1981). If the school committee determines that additional funds are necessary, it must pursue funding through the usual municipal finance system, and request, through the mayor, a supplemental appropriation by the city council. Under St. 1909, c. 486, § 3, however, the mayor may decline to submit the request to the city council, provided such action does not contravene the provisions of G. L. c. 150E. *Id. Boston Teachers Local 66* v. *Boston*, 382 Mass. 553, 558-559 (1981).

We briefly state the pertinent facts. On August 29, 1980, the school committee approved a three-year collective bargaining agreement with the BTU, to be effective for the period September 1, 1980, until August 31, 1983, subject to appropriation of funds by the city council and the mayor. The collective bargaining agreement has a job security

require that the Mayor of Boston submit to the City Council a request for an appropriation for sufficient funds to pay for wages and salary increases in the second and third years of negotiated collective bargaining agreements with school department employees?" The answer to this question is subsumed in our discussion, *infra*, and we therefore do not answer it separately.

386 Mass. 197                                             201

Boston Teachers Union, Local 66, v. School Committee of Boston.

clause which provides that during the first two years of the agreement "any teacher or nurse with tenure or permanently appointed shall continue to be employed." Also on August 29, 1980, the school committee requested that the mayor transmit to the city council a request for a supplemental appropriation in the amount of $15.1 million to fund the incremental cost items in various collective bargaining agreements, including the BTU agreement. On October 1, 1980, pursuant to orders of the Superior Court in Suffolk County and the Appeals Court,[6] the mayor submitted a request to the city council for $15.1 million to fund collective bargaining contracts, and on that day the city council appropriated $15.1 million for that purpose.

On or about March 12, 1981, the mayor notified the school committee that he would not provide for fiscal year 1981-1982 any funds in addition to the amount the school committee may appropriate in its own right pursuant to St. 1936, c. 224. That amount is approximately $210 million. See *Board of Educ.* v. *Boston, ante* 103, 105 n.5 (1982).[7] Maintenance of staffing levels in fiscal year 1980-1981 required an approximate expenditure of $236 million, or $26 million more than the amount available to the school committee under St. 1936, c. 224, for the current fiscal year 1981-1982. The reason for the discrepancy between the amount required to finance the schools in 1980-1981 and the amount available under St. 1936, c. 224, is not stated in the record. However, it is apparent that at least some, if not all, of the difference is a result of the school committee's action in spending in excess of appropriations during 1980-1981, the excess not being included in the school committee's St. 1936,

---

[6] These orders were subsequently upheld by this court. See *Boston Teachers Local 66* v. *Boston,* 382 Mass. 553 (1981).

[7] In the proceedings before the Superior Court judge, the mayor contended that the school committee was entitled to appropriate only $190 million, and the school committee contended that it was entitled to appropriate $205 million plus $5 million for alterations and repairs. The judge ruled in favor of the school committee, and the mayor has not appealed this decision.

c. 224, appropriation for 1981-1982. See *Board of Educ.* v. *Boston, supra* at 113 n.17. In addition, approximately $12.1 million in increased funding will be required to fund negotiated salary increases under the collective bargaining agreement with the BTU.

On May 1, 1981, the school committee caused 2,261 tenured teachers and permanently appointed nurses to be notified that the school committee would vote on the recommendation of the acting superintendent of schools to lay off or dismiss these employees effective August 21, 1981. The parties agree that such a termination violates the job security clause of the collective bargaining agreement. The judge found it probable that a substantial number of the persons who received notice would be laid off.[8] The necessity of laying off tenured teachers appears to be increased in part by an outstanding Federal District Court order under which the school committee must maintain the current ratio of black and other minority teachers in the faculty. The ratio of black and other minority teachers is much higher among nontenured teachers; thus any significant reduction of the nontenured faculty may violate the Federal District Court's order.

On July 23, 1981, the school committee formally requested that the mayor and city council appropriate $9.73 million[9] to implement salary increases for the second year of various collective bargaining agreements, including those entered into with the BTU and the other union interveners. No action has been taken on this request.

---

[8] The record does not disclose whether the lay offs have actually been implemented, and, if so, how many teachers have been laid off.

While it is apparent that a lack of funds was the primary reason for the lay offs, it is relevant to note that student enrollments in the Boston public schools between 1970 and 1981 have declined steadily, reducing the student population by approximately one-third.

[9] This amount includes the $8.2 million that is the object of the BTU's request for relief in the third action, mentioned at the beginning of this opinion.

1. *Enforceability of Provisions for Salary Increases.*[10]

The school committee contends that the salary increases for the second and third years of the collective bargaining agreement are unenforceable in the absence of an appropriation by the city council to fund those increases. It argues that in enacting G. L. c. 150E, the Legislature intended to preserve the annual appropriation process so as to require an appropriation by the city council as a condition precedent to the enforceability of any part of a collective bargaining agreement entered into pursuant to c. 150E that would require an appropriation of funds. We disagree.

General Laws c. 150E, § 7, reproduced in the margin,[11] authorizes collective bargaining agreements for up to three

---

[10] It is appropriate here to acknowledge the existence and impact of St. 1980, c. 580, popularly known as "Proposition 2 ½," which, among other things, restricts the ability of municipalities to raise revenues through property and excise taxes. In certain cases, Proposition 2 ½ may be relevant in interpreting other laws of the Commonwealth that bear on the fiscal responsibilities of municipalities. We need not decide in this case, however, the extent, if any, to which Proposition 2 ½ influences our thinking, since other sources of statutory and case law provide sufficient bases for our decisions.

It is also to be observed that, at least with respect to parts 1 and 2 of this opinion, our discussion is largely peculiar to the city of Boston. This is because Boston's method of financing its public schools differs from that of the other cities and towns of the Commonwealth.

[11] The pertinent provisions of G. L. c. 150E, § 7, as amended through St. 1980, c. 354, § 17A, are as follows:

"(*a*) Any collective bargaining agreement reached between the employer and the exclusive representative shall not exceed a term of three years. The agreement shall be reduced to writing, executed by the parties, and a copy of such agreement shall be filed with the commission and with the house and senate committees on ways and means forthwith by the employer.

"(*b*) The employer, other than the board of regents of higher education, the chief administrative justice of the trial court or the state lottery commission, shall submit to the appropriate legislative body within thirty days after the date on which the agreement is executed by the parties, a request for an appropriation necessary to fund the cost items contained therein; provided, that if the general court is not in session at that time, such request shall be submitted at the next session thereof. If the appropriate legislative body duly rejects the request for an appropriation necessary to fund the cost items, such cost items shall be returned to the parties

years' duration. We think that the requirement in § 7 (b), that the employer submit a request to the appropriate legislative body for an appropriation sufficient to fund the cost items of the agreement, applies only to funds needed in the first year of the agreement, and that an appropriation funding the first year of the contract constitutes an approval by the legislative body of the entire agreement. The context of this provision suggests that this is the proper interpretation. Section 7 (b) states that a request for an appropriation is to be submitted "within thirty days after the date on which the agreement is executed by the parties." It further states that if the legislative body rejects the request, "such cost items shall be returned to the parties for further bargaining." We conclude that these terms are intended to apply only to the first year of the agreement. In order for § 7 (b) to be construed consistently with § 7 (a), authorizing contracts of three years' duration, the statute must be read as contemplating an initial approval of the contract by the legislative body, followed by appropriations as a matter of course in the succeeding years of the contract.

Our holding here is consistent with our opinion in *Mendes* v. *Taunton*, 366 Mass. 109 (1974), which also involved salary increases in the second year of collective bargaining agreements. In *Mendes*, the Appeals Court had in an earlier decision held that G. L. c. 44, § 33A, rendered ineffective the salary increases in the second year of the agreements. 1 Mass. App. Ct. 486 (1973). We reached a contrary conclusion, and in so doing we pointed out that such a construction of § 33A "would render virtually ineffective the important provision in G. L. c. 149, § 178I, permitting three-year collective bargaining contracts for municipal employees" (footnote omitted). 366 Mass. at

for further bargaining. The provisions of the preceding two sentences shall not apply to agreements reached by school committees in cities and towns in which the provisions of section thirty-four of chapter seventy-one are operative."

113.[12]   See also *Kerrigan* v. *Boston,* 361 Mass. 24, 33-34 (1972).

We also observe that the legislative history of G. L. c. 150E suggests a legislative intent that salary increases in the second and third years of multiyear contracts for public employees be enforceable. The Appeals Court decision in *Mendes* v. *Taunton,* 1 Mass. App. Ct. 486 (1973), was issued on September 27, 1973. Chapter 150E was signed into law on November 26, 1973. Among the last amendments to the bill that became c. 150E, was what is now G. L. c. 150E, § 7 (*d*) (*f*), which provides that if there is a conflict between the terms of a collective bargaining agreement and G. L. c. 44, § 33A, the terms of the agreement shall prevail. The bill inserting § 7 (*d*) (*f*) was first proposed in the House on October 30, and was adopted on October 31, *after* the Appeals Court issued its decision in *Mendes.* See 1973 House Doc. No. 7715. Earlier versions of the bill made no reference to § 33A. See, e.g., 1973 Senate Doc. No. 1771; 1973 Senate Doc. No. 1929; 1973 House Doc. No. 6194. This chronology of events suggests that § 7 (*d*) (*f*) was inserted in response to the Appeals Court's decision in *Mendes,* and that the Legislature wanted to remove any obstacle to the enforceability of clauses in collective bargaining agreements that provide for future salary increases.

The school committee argues that G. L. c. 150E, § 7 (*c*), supports its conclusion that the salary increases are not enforceable until funded by an appropriation. Section 7 (*c*) provides that, with respect to collective bargaining contracts entered into with certain State employees, the employer shall submit to the General Court an estimate of the "incremental cost items"[13] necessary to fund the con-

---

[12] Part II of this court's opinion in *Mendes* v. *Taunton,* 366 Mass. 109, 117-119 (1974), contains dicta which the school committee asserts support a different conclusion. To the extent that any language in that part of the opinion is inconsistent with our holding here, we do not follow it.

[13] Incremental cost items are defined as "the provisions of a collective bargaining agreement that require, in respect of any fiscal year, an appro-

206                                                    386 Mass. 197

Boston Teachers Union, Local 66, v. School Committee of Boston.

tract in the years after the first year, this estimate to be submitted with the initial request for an appropriation and within thirty days after the execution of the contract. The school committee states that this informational requirement is meaningful only if it were contemplated that the initial funding of the contract by the Legislature would constitute an approval of the entire agreement. It is argued that this implicitly recognizes the enforceability of clauses that require appropriations in the future years of a collective bargaining agreement; however, the argument continues, since § 7 (c) applies only to contracts entered into with certain *State* employees, it therefore indicates a legislative intent *not* to recognize the enforceability, absent annual appropriations, of such provisions in contracts entered into with *municipal* employees pursuant to § 7 (b). We think that this reads too much into the language of § 7 (b) and (c). If the Legislature had intended that clauses providing for salary increases be enforceable by State employees but not municipal employees, it could have said so in plainer language. Moreover, the history of G. L. c. 150E indicates that one of the purposes of the act was to put municipal and State employees on an equal footing in regard to their collective bargaining rights and procedures.[14] Section 7 (c) imposes an obligation on certain employers to provide information to the legislative body. We believe that its purpose stops there.

---

priation by a legislative body that is greater than the appropriation so required in the preceding fiscal year." G. L. c. 150E, § 1, inserted by St. 1976, c. 480, § 20.

[14] See the Fifth Interim Report of the Special Legislative Study Commission on Collective Bargaining, 1973 House Doc. No. 6194, at 6-7 (letter of transmittal sent by commission chairman to the Governor, the Senate, and the House of Representatives).

Prior to the enactment of G. L. c. 150E, Massachusetts public labor law treated State employers and employees differently from municipal ones. See former G. L. c. 149, §§ 178D, 178F-178N.

It is also argued that St. 1909, c. 486, § 16,[15] precludes the city from entering into any contract for the future payment of monies in excess of appropriations. This provision is quite similar to G. L. c. 44, § 31, which applies to all cities and towns except Boston.[16] Decisions arising under the latter statute are therefore helpful in interpreting the Boston statute and its effect upon G. L. c. 150E, § 7 (*a*).

The purpose of G. L. c. 44, § 31, is "to set rigid barriers against expenditures in excess of appropriations." *Marlborough* v. *Cybulski, Ohnemus & Assocs.*, 370 Mass. 157, 160 (1976), quoting *McCarthy* v. *Malden*, 303 Mass. 563, 565 (1939). The statute has been applied rigidly and with few exceptions. *Marlborough* v. *Cybulski, Ohnemus & Assocs., supra. Arthur B. Murphy, AIA & Assocs.* v. *Brockton*, 364 Mass. 377, 380 (1973). In general, where a municipal officer enters into a contract that involves the expenditure of funds in excess of appropriations, that contract will be held unenforceable. *Duff* v. *Southbridge*, 325 Mass. 224 (1950). *McHenry* v. *Lawrence*, 295 Mass. 119 (1936). *Dyer* v. *Boston*, 272 Mass. 265 (1930). Nevertheless, this court has recognized that in some situations a different

---

[15] Statute 1909, c. 486, § 16, which applies only to Boston, provides: "No official of said city, except in case of extreme emergency involving the health or safety of the people or their property, shall expend intentionally in any fiscal year any sum in excess of the appropriations duly made in accordance with law, nor involve the city in any contract for the future payment of money in excess of such appropriation, except as provided in section six of [St. 1909, c. 486]. Any official who shall violate the provisions of this section shall be punished by imprisonment for not more than one year, or by a fine of not more than one thousand dollars, or both."

[16] In pertinent part, G. L. c. 44, § 31, as amended through St. 1979, c. 194, § 1, states: "No department financed by municipal revenue, or in whole or in part by taxation, of any city or town, except Boston, shall incur a liability in excess of the appropriation made for the use of such department, each item recommended by the mayor and voted by the council in cities, and each item voted by the town meeting in towns, being considered as a separate appropriation, except in cases of extreme emergency involving the health or safety of persons or property, and then only by a vote in a city of two thirds of the members of the city council, and in a town by a majority of all the selectmen."

statutory or public policy may demand a more flexible approach to municipal contracting practices.

When the power of a municipality to enter into certain types of contracts would be unreasonably restricted by requiring it to appropriate at the inception of the contract the entire amount owed under the contract, including amounts owed in future years, the prohibition on expenditures in excess of appropriations will not be held to invalidate the contract. See *Salisbury Water Supply Co.* v. *Salisbury,* 341 Mass. 42 (1960); *Clarke* v. *Fall River,* 219 Mass. 580, 585-586 (1914). See also *Lynn Redevelopment Auth.* v. *Lynn,* 360 Mass. 503 (1971). This court has also held that, where salary increases are provided for by a valid ordinance, it is incumbent on the mayor and the city to pay the increases, and the fact that the city has failed to make the necessary appropriations constitutes no defense in an action to recover wages. This applies to future salary increases as well as presently effective ones. *Rock* v. *Pittsfield,* 316 Mass. 348 (1944). See *Doherty* v. *Woburn,* 345 Mass. 523 (1963); *Callahan* v. *Woburn,* 306 Mass. 265 (1940).

We also observe that if a municipality wrongfully fails to appropriate sufficient monies to satisfy an enforceable contractual obligation (one not rendered invalid by G. L. c. 44, § 31), the city may nevertheless not be required to spend in excess of appropriations; rather the appropriate remedy is one in contract, unless some other exclusive remedy has been statutorily created. *Callahan* v. *Woburn, supra* at 273-278. *Decatur* v. *Auditor of Peabody,* 251 Mass. 82 (1925). *Barnard* v. *Lynn,* 295 Mass. 144 (1936). See *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 464-468 (1976). See also G. L. c. 41, § 108, second sentence, last clause.

We conclude that a clause in a collective bargaining agreement that provides for salary increases in the second or third years of the agreement is valid and enforceable, notwithstanding the provisions of St. 1909, c. 486. In other areas the Legislature has authorized various municipal con-

tracts for terms of between three and thirty years. G. L. c. 40, § 4. It would be absurd to say that those contracts are unenforceable unless an appropriation has been made for the entire obligation. *Salisbury Water Supply Co.* v. *Salisbury, supra.* Likewise, when the Legislature has authorized collective bargaining contracts for terms not to exceed three years, it would be anomalous to say that clauses relating to wage levels and increases are enforceable for one year only.

The city urges that if the salary increases are held enforceable, the school committee should be required to pay the increases out of the funds that it may appropriate pursuant to St. 1936, c. 224, and that the city should not be compelled to appropriate any funds in excess of that amount. It is argued that to require the city council to appropriate these funds would contradict the legislatively established balance between the responsibilities of the school committee and the city council for financing the Boston public schools. See *School Comm. of Boston* v. *Boston,* 383 Mass. 693, 700-705 (1981). We disagree.

The city council approved the entire collective bargaining agreement when it appropriated the necessary funds on October 1, 1980. Presumably the city council knew that there were incremental cost items that would require funding in the second and third years of the agreement. We think that when the city council approved the contract, it in essence agreed to fund those incremental cost items.[17] The discretion of the city council in appropriating funds in addition to

---

[17] In the usual case, the approval of a collective bargaining agreement by a legislative body would constitute an agreement by the legislative body to appropriate in each year the entire amount necessary to fund the contract for that year. The Boston school committee, however, is empowered to appropriate, essentially, an amount equal to the amount required to finance the school system in the preceding year. The Boston city council, therefore, "agreed" only to appropriate amounts not covered by the appropriation powers of the school committee.

Our holding should not be construed to obligate the city council to appropriate any funds for positions that have been abolished.

those appropriated pursuant to St. 1936, c. 224, is no more affected than the discretion of any other legislative body in funding salary increases pursuant to G. L. c. 150E. Nor is there any inconsistency with the Legislature's statutory limit on the Boston school committee's appropriation power. It is the collective bargaining agreement that mandates the appropriation, not the school committee, and the city council retains its power, in the first year of the agreement, to reject the collective bargaining agreement and refuse to make the appropriations. Compare *School Comm. of Boston* v. *Boston, supra.*[18] We do not believe that the Legislature intended to allow the Boston city council to appropriate the incremental costs in the first year of the contract and then refuse to appropriate further incremental costs in the second and third years of the contract, thereby forcing the school committee to disrupt its normal allocation plan in order to pay the increases. We conclude, therefore, that the mayor and the city council should provide in the annual budget of the city for an appropriation of funds necessary to pay the salary increases that are provided in the collective bargaining agreement. As in the first year of the agreement, the role of the mayor is "a ministerial one." *Boston Teachers Local 66* v. *Boston,* 382 Mass. 553, 560 (1981). Employees who do not receive the pay increases to which they are entitled may proceed against the city for

---

[18] In *School Comm. of Boston* v. *Boston,* 383 Mass. 693 (1981), we held that the city's obligation under G. L. c. 71B, § 5, to provide funding for special education does not require the Boston city council to appropriate funds in addition to the funds that may be appropriated by the school committee pursuant to St. 1936, c. 224. The case was decided in part on the basis of the principle that "absent a clear legislative intent to the contrary the provisions of a special charter generally prevail over conflicting provisions of a subsequently enacted general law." *Id.* at 700. There, however, a different result would have negated the discretion of the city council to refuse funding in excess of that appropriated pursuant to St. 1936, c. 224. Here, on the other hand, the city council voluntarily chose to embark on a course of funding in excess of the school committee's appropriation limit.

386 Mass. 197                                                          211

Boston Teachers Union, Local 66, *v.* School Committee of Boston.

breach of contract or through a grievance procedure pursuant to G. L. c. 150E, § 8.[19]

2. *Enforceability of the Job Security Clause.*

It is by now well established in this State that public policy may limit the ability of a public employer to bind itself in a collective bargaining agreement. E.g., *School Comm. of Braintree* v. *Raymond,* 369 Mass. 686 (1976); *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492, 500-502 (1970). This gloss on public sector collective bargaining statutes is deemed necessary in order that the collective actions of public employees do not distort the normal political process for controlling public policy. See generally *School Comm. of Boston* v. *Boston Teachers Local 66,* 378 Mass. 65, 71 (1979). In the context of public education, this court has held that specific appointment determinations, and decisions to abolish positions are within the exclusive managerial prerogative of a school committee, and thus beyond the scope of collective bargaining. *Berkshire Hills Regional School Dist. Comm.* v. *Berkshire Hills Educ. Ass'n,* 375 Mass. 522 (1978). *School Comm. of Braintree* v. *Raymond,* 369 Mass. 686 (1976). *School Comm. of Hanover* v. *Curry,* 369 Mass. 683 (1976). See *School Comm. of Danvers* v. *Tyman,* 372 Mass. 106, 111-112 (1977), and cases cited. Likewise it has been held that the decision to reduce a teacher's workload, as part of a decision to eliminate 5.6 teaching positions from the school committee's budget, constituted an exercise of its nondelegable managerial powers. *School Comm. of Lynnfield* v. *Trachtman,* 11 Mass. App. Ct. 524 (1981), *S. C.,* 384 Mass. 813 (1981). On the other hand, this court in *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 464 (1976), held that terms of a collective bargaining agreement relating to class size and teaching load "may be enforced where there has been no change in educational policy

---

[19] The record does not permit us to determine the extent to which any grievance provisions in the various collective bargaining agreements are controlling with respect to the method by which the employees may vindicate their contractual rights.

and funds are available to implement the terms of the agreement."

We are of the opinion that a provision in a collective bargaining agreement that attempts to restrict the ability of a school committee to determine on an annual basis the size of its teaching staff intrudes into an area of exclusive managerial prerogative. General Laws c. 71, § 37, provides that the school committee "shall have general charge of all the public schools . . . ." Essential to the management of the public schools is the ability to determine the appropriate size of the teaching staff in light of available funds. We do not believe that the Legislature, in G. L. c. 150E,[20] meant to permit school committees to bargain away their managerial powers in this area. We are not persuaded by the contrary conclusion of the New York Court of Appeals in *Board of Educ. of the Yonkers City School Dist. v. Yonkers Fed'n of Teachers*, 40 N.Y.2d 268 (1976), reached on facts similar to this case. The approach taken in that case is contrary to our cases, cited *supra* at 211, which hold that the abolition of positions is within the area reserved to the managerial prerogative of the school committee. Moreover, our tenure statute, G. L. c. 71, § 42, suggests a legislative intent to reserve such decisions to the school committee. Section 42, relating to dismissals of tenured teachers, provides, in pertinent part, that "[n]either this nor the preceding section shall affect the right of a committee to dismiss a teacher whenever an actual decrease in the number of pupils in the schools of the town renders such action advisable." Although the quoted provision in § 42 by its terms applies only to dismissals caused by declining enrollments, general economy and efficient use of scarce funds are analogous considerations in the decision to reduce

---

[20] General Laws c. 150E governs collective bargaining in the public sector. It provides that the public employer "shall negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment . . . ." G. L. c. 150E, § 6, inserted by St. 1973, c. 1078, § 2. The statute is silent regarding matters about which the employer *may* negotiate.

staff size (see our discussion *infra* at 214-216). See *School Comm. of Lynnfield* v. *Trachtman,* 11 Mass. App. Ct. 524 (1981), S. C., 384 Mass. 813 (1981). Section 42 can therefore be said to illustrate a policy of leaving this entire area of decision-making to the managerial discretion of the school committee.

We recognize, however, the substantial interest of the employee in having some assurance of security in his or her employment. During the course of a school year this interest is particularly acute: a layoff in the middle of a school year makes it very difficult for a teacher to obtain other employment in the teaching field until the following school year. The interest in protecting the managerial prerogative of the school committee, on the other hand, diminishes once the year's budget has been established. Employees should reasonably be able to expect a school committee to adhere to its determination of appropriate staff size during the fiscal year. For this reason we conclude that a job security clause is enforceable for periods not spanning more than one fiscal year.

Our decision also should not be interpreted as holding that all matters relating to the laying off of employees are beyond the scope of collective bargaining. In *School Comm. of Boston* v. *Boston Teachers Local 66,* 378 Mass. 65, 72 (1979), we observed that even though certain decisions may be within the exclusive prerogative of the school committee, the *procedures* set forth in a collective bargaining agreement for resolving such determinations may be enforced. It follows that matters relating to the timing of layoffs and the number and identity of the employees affected are proper subjects of collective bargaining. See *Fire Fighters Local 1186* v. *Vallejo,* 12 Cal.3d 608, 621-622 (1974). See also *Beloit Educ. Ass'n* v. *Employment Relations Comm.,* 73 Wis.2d 43, 58-60 (1976). In addition, the *impact* of a decision to lay off teachers may be the subject of negotiation and arbitration. See *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455 (1976). Cf. *School Comm. of Boston* v. *Boston Teachers Local 66,*

*supra* at 71-73. A layoff of teachers may affect class size, workload, or the number of classes taught by the remaining teachers. We express no opinion here, however, regarding the extent to which the remaining teachers whose contract rights with respect to these subjects have been violated can obtain relief in arbitration.

Because our holding relative to the enforceability of the job security clause is based upon the managerial prerogative of the school committee, it could be argued that the mayor or city council have no standing to assert the invalidity of the clause, since the school committee, and not the mayor or city council, is entrusted with the authority to manage the public schools. G. L. c. 71, § 37. It could be said, therefore, that a job security clause should be enforceable against the legislative body of a municipality if the school committee decides as a matter of educational policy that the clause ought to be enforced and requests an appropriation of the necessary funds. In the case of Boston, however, we must harmonize our interpretation of c. 150E with Boston's unique system of financing its public schools. See *School Comm. of Boston* v. *Boston,* 383 Mass. 693, 700 (1981). As noted earlier, St. 1936, c. 224, empowers the Boston school committee to maintain the same level of funding as in the preceding year. We think that this has the effect of placing the financial burden of maintaining job security in the Boston school system primarily on the school committee. Thus only the incremental costs of collective bargaining agreements, i.e., salary increases, which are not included in the formula in St. 1936, c. 224, should be appropriated by the city council. We conclude, therefore, that the Boston school committee may not compel an appropriation by the city council for the purpose of enforcing a job security clause in a collective bargaining agreement.

3. *Hearings Pursuant to G. L. c. 71, § 42.*

The BTU argues that the tenured teachers who are laid off are entitled to individual hearings pursuant to G. L.

c. 71, § 42.[21]   In *Milne v. School Comm. of Manchester*, 381 Mass. 581 (1980), we held that notice and hearing requirements of § 42 do not apply to dismissals based solely on an actual decrease in student enrollments.   See also *Lane v. School Comm. of Paxton*, 378 Mass. 794 (1979).   We conclude that the instant case is controlled by our decision in *Milne*.   Logic dictates that dismissals based on budgetary considerations be treated no differently from dismissals made because of declining enrollments.   Both factors are very similar in their nature, and they often coexist, as is the case here, see note 8, *supra*.   Both are established in law as constituting "good cause" for the dismissal of a teacher — the former by case law, see *School Comm. of Foxborough v.*

---

[21] General Laws c. 71, § 42, as amended through St. 1972, c. 464, § 2, provides in pertinent part:   "The school committee may dismiss any teacher, but no teacher and no superintendent, other than a union superintendent and the superintendent of schools in the city of Boston, shall be dismissed unless by a two thirds vote of the whole committee. . . . In every such town a teacher or superintendent employed at discretion under section forty-one or a superintendent employed under a contract, for the duration of his contract, shall not be dismissed, except for inefficiency, incapacity, conduct unbecoming a teacher or superintendent, insubordination or other good cause, nor unless at least thirty days, exclusive of customary vacation periods, prior to the meeting at which the vote is to be taken, he shall have been notified of such intended vote; nor unless, if he so requests, he shall have been furnished by the committee with a written charge or charges of the cause or causes for which his dismissal is proposed; nor unless, if he so requests, he has been given a hearing before the school committee which may be either public or private at the discretion of the school committee and at which he may be represented by counsel, present evidence and call witnesses to testify in his behalf and examine them; nor unless the charge or charges shall have been substantiated; nor unless, in the case of a teacher, the superintendent shall have given the committee his recommendations thereon. . . .   Neither this nor the preceding section shall affect the right of a committee to dismiss a teacher whenever an actual decrease in the number of pupils in the schools of the town renders such action advisable.   In case a decrease in the number of pupils in the schools of a town renders advisable the dismissal of one or more teachers, a teacher who is serving at the discretion of a school committee under section forty-one shall not be dismissed if there is a teacher not serving at discretion whose position the teacher serving at discretion is qualified to fill.   No teacher or superintendent who has been lawfully dismissed shall receive compensation for services rendered thereafter."

*Koski,* 8 Mass. App. Ct. 870 (1979); *Nutter* v. *School Comm. of Lowell,* 5 Mass. App. Ct. 77, 81 (1977); see also *McSweeney* v. *Town Manager of Lexington,* 379 Mass. 794, 797 (1980), and the latter by § 42. For these reasons, and for the reasons stated in *Milne, supra,* we construe § 42 not to require notice and a hearing when a tenured teacher is dismissed solely because of budgetary considerations provided, of course, that such reasons are not proffered by the school committee as a sham or subterfuge.

It is to be observed that § 42 creates a substantive right of a tenured teacher not to be dismissed because of a decrease in the number of pupils, if there is a nontenured teacher whose position the tenured teacher is qualified to fill. In light of our interpretation of § 42, it follows, a fortiori, that this same substantive right also extends to a tenured teacher who is dismissed for reasons of economy and efficiency. Teachers who are aggrieved by an alleged violation of the substantive right provided by this provision may assert their claims through normal judicial proceedings, or, if their contract so provides, through arbitration. We hold, however, that in all such cases, the notice and hearing requirements of § 42 are inapplicable.[22]

---

[22] Our holding reveals a possible defect in § 42, inasmuch as certain substantive tenure rights remain unprotected by the notice and hearing requirements of that section. It could be argued that a hearing under G. L. c. 71, § 42, should be required whenever a tenured teacher who has been dismissed because of declining enrollments or fiscal limitations can demonstrate that there is an untenured teacher whose position the tenured teacher is arguably qualified to fill. It could even be argued that prior cases construing § 42 give credence, sub silentio, to this approach. Compare the facts in *Setterlund* v. *Groton-Dunstable Regional School Comm.,* 382 Mass. 328 (1981), *Woodward* v. *School Comm. of Sharon,* 5 Mass. App. Ct. 84 (1977), *Nutter* v. *School Comm. of Lowell,* 5 Mass. App. Ct. 77 (1977), with those in *Milne* v. *School Comm. of Manchester,* 381 Mass. 581 (1980), *Lane* v. *School Comm. of Paxton,* 378 Mass. 794 (1979), *Kaplan* v. *School Comm. of Melrose,* 363 Mass. 332 (1973), *Jantzen* v. *School Comm. of Chelmsford,* 332 Mass. 175 (1955), *Downey* v. *School Comm. of Lowell,* 305 Mass. 329 (1940), *Boody* v. *School Comm. of Barnstable,* 276 Mass. 134 (1931), *School Comm. of Foxborough* v. *Koski,* 8 Mass. App. Ct. 870 (1979). Cf. *Black* v. *School Comm. of Malden,* 365 Mass. 197, 203-205 (1974). It is consistent with such a view

4. *Conclusion.*

The salary increases for fiscal year 1981-1982 provided in the collective bargaining agreements entered into pursuant to G. L. c. 150E are valid and enforceable notwithstanding the lack of an appropriation to fund those increases. The mayor and the city council should appropriate funds to pay those increases, and if they fail to do so, the employees may recover damages from the city. The no-layoff clause in the agreement is not enforceable against the school committee to the extent that it infringes on the managerial prerogative of the school committee to determine on an annual basis the appropriate staffing levels in the school system. To the extent that the school commmmittee voluntarily chooses to enforce the no-layoff clause, it may not compel the city council to appropriate money for that purpose. Finally, the school committee is not required under G. L. c. 71, § 42, to provide individual hearings for the teachers who have been laid off.

In the case reported by the Superior Court judge, further proceedings are to be had in the Superior Court in accordance with this opinion. The judgments entered in the other two cases are vacated and the cases are remanded to the Superior Court for proceedings consistent with this opinion.

*So ordered.*

that § 42 apparently contemplates that questions relating to the qualifications of tenured teachers be determined in the first instance by the school committee, rather than a court.

Creating a workable solution along the lines described above, however, would involve this court in unwarranted judicial legislation. We observe, for example, that § 42 does not purport to create seniority rights as among tenured teachers. If a number of tenured teachers who are dismissed because of declining enrollments or fiscal limitations are able to claim that they are all qualified to fill one position held by a nontenured teacher, requiring individual hearings for the tenured teachers would serve little purpose, since none of them could assert any particular entitlement to that position. Also, if seniority rights were created by contract, it might be said that only the hearing demanded by the most senior of the tenured teachers would be meaningful, and that all other hearings would be for naught. It would seem, then, that the creation of seniority rights may be necessary to the formulation of a practicable solution for affording such teachers the right to a notice and hearing. The Legislature, and not this court, is best equipped to address these problems.