17 Mass. App. Ct. 104 (1983)
455 N.E.2d 1231
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
vs.
BOSTON CARMEN'S UNION, DIVISION 589, AMALGAMATED TRANSIT UNION, AFL-CIO-CLC.
Appeals Court of Massachusetts, Suffolk.
September 23, 1983.
November 16, 1983.
Present: GREANEY, KAPLAN, & KASS, JJ.
Joseph H. Elcock (Ronald G. Busconi & Carol A. Buckley with him) for the plaintiff.
Douglas Taylor, of the District of Columbia (George E. O'Brien with him) for the defendant.
KAPLAN, J.
After arbitration under a collective bargaining agreement between the Massachusetts Bay Transportation *105 Authority (Authority) and the Boston Carmen's Union, Division 589, Amalgamated Transit Union, AFL-CIO-CLC (Union), an impartial umpire (hereafter called arbitrator) on September 29, 1979, rendered an award (1) declaring that the Authority had violated the agreement by contracting with a certain nonprofit corporation called Transporting the Handicapped and Elderly in Massachusetts, Inc. (THEM), to operate a "dial-a-ride" service (Ride), and (2) directing that certain corrective action be taken.
On October 21, 1979, the Authority, as plaintiff, commenced the present action in Superior Court to vacate the award. The defendant Union answered and counterclaimed to confirm it. On December 14, 1979, the Union moved for summary judgment, and the Authority responded on May 28, 1980, by opposing the Union's motion and cross moving for summary judgment. These motions were referred to a master who, more than a year later, in June, 1981, recommended a decision in favor of the Union, and the judge made an order to that effect on June 29, 1981.[1] Some months later, on November 16, 1981, the Union, complaining of the Authority's failure to comply with the award as confirmed by the order, sought an adjudication of contempt. At that point the Authority observed that no judgment had been entered on the June 29 order. A judgment corresponding to the June 29 order was entered on December 31, 1981. The Authority filed its notice of appeal therefrom on January 6, 1982, attacking the confirmation of the award, and on January 12, 1982, the Union withdrew its contempt application.[2]
1. Arbitral issue. The Urban Mass Transportation Act, 49 U.S.C. § 1601 et seq. (1976), requires that agencies such as the Authority which secure Federal assistance under its terms shall furnish special service for the handicapped and elderly. See id., § 1612. This the Authority proceeded to *106 do in 1977, first utilizing THEM and its rudimentary Ride for the purpose.[3] When, in 1978, it appeared that Ride was passing from a small, experimental phase to a large, permanent one, the Union called on the Authority, in effect, to recognize Ride as Union work within the collective bargaining agreement, and accordingly to confer about specific terms of employment. The parties met, but without result. On December 29, 1978, the Authority entered into a "service agreement" with THEM embodying the more permanent arrangement.
The parties waived the preliminary grievance procedure and went direct to arbitration on a stated "issue" as follows: "Did the Authority violate the collective bargaining agreement by contracting with ... [THEM] to operate its DIAL-A-RIDE service? If so, what should be the remedy?" The matter was heard in April, 1979, and a decision and award came down on September 20, 1979.
2. Arbitrator's decision. (a) The arbitrator found that under the contract finally settling the relations between the Authority and THEM, "the control exercised by the [Authority] over THEM in all facets of the Ride operation constitutes a single employer for labor relations purposes." THEM, which had pioneered Ride, was now an agent of the Authority, indeed little more than a shell: the Authority provided it with vehicles and wherewithal (passing to it the allocable Federal funds) and commanded thoroughly THEM's operations, including the conduct of labor relations and decisions regarding the number of employees and their wages and benefits.[4]
Treating those nominally employees of THEM as being in fact employees of the Authority for labor relations purposes, the arbitrator held that their work in and about Ride was confided for these purposes to the present Union. This followed from section 111 of the collective agreement:

*107 "Development of New Forms of Transportation. Any new form of transportation or any work of blue-uniformed employees which, in the future, may be developed and put in operation by the Authority and which is not already covered by this Agreement, regarding wages, conditions, questions of seniority, etc., shall be settled by conference between the duly authorized Officers of the Division and the Authority."
The arbitrator found that Ride was a "new form of transportation" serving the handicapped and elderly. It was similar to existing operations but involved transportation door-to-door on a call basis with drivers assisting passengers on and off the vehicles. Rejected was the Authority's argument that to qualify as "[a]ny new form of transportation" the carriage must be by buses (specially equipped), not vans, over fixed routes, not door-to-door, on regular schedules, not on call.[5]
(b) If his finding about Authority control could perchance be thought wrong, the arbitrator went on to say, then there would be a violation of section 102 of the collective agreement which, under the title "Management Rights," and after enumerating a number of these rights, stated: "It is not intended by this provision to give the management the right unilaterally to subcontract bargaining unit work."[6]
There was no force in the Authority's contention, said the arbitrator, that § 5(k) of G.L.c. 161A (the Authority's constitutive legislation) obliged the Authority to enter into a subcontract relation with THEM under which THEM might employ non-Union personnel. Section 5(k), inserted by St. 1964, c. 563, § 18 (set out in pertinent part in the *108 margin)[7] states a preference for existing private carriers when the Authority desires to add "new routes," but THEM, although serving a small area before its virtual takeover by the Authority, did not operate "routes," and in fact the limited service it offered "paralleled, crossed, and duplicated existing... routes [of the Authority]." There had been a very large expansion of Ride since the Authority came in, and § 5(k) "cannot be distorted to require the [Authority] to take control of a private carrier's operations and then expand those operations by greater and greater infusions of bargaining unit work."[8]
(c) The arbitrator added that the Authority, by its contract with THEM, so far as that might be taken to exclude Ride from the scope of the collective bargaining agreement, would violate "the basic purpose, as well as the specific provisions" of a so-called "13(c) agreement" between the Authority and the Union (together with other unions). The 13(c) agreement derived from the like-numbered section of the Urban Mass Transportation Act, codified as 49 U.S.C. § 1609(c) (1976). This provision of the statute states that it shall be a condition of assistance "that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance." Certain required protective arrangements are then described, of which the purpose, according to the arbitrator, was to guard against the possible adverse effects on *109 existing employees of the use of the granted funds. But the Authority had used these Federal funds in a manner calculated to hurt its existing unionized employees: it had applied the money to expand and take over Ride while attempting to keep this work clear of the Union; thus it deprived the members of their just rights under the collective agreement, including seniority rights.
3. The award. It reads:
"The Authority violated the collective bargaining agreement by contracting with Transporting the Handicapped and Elderly in Massachusetts, Inc. (THEM), to operate its DIAL-A-RIDE service.
"The Authority is directed to forthwith assign this work to bargaining unit employees, and to negotiate with the officers of Local 589 the terms of an orderly transfer of the work."
The first paragraph, couched in the form of a declaration of contract breach, meant that Ride fell under the collective bargaining agreement as Union work; hence the direction in the second paragraph to assign the work to unit employees. And that paragraph called for negotiation of the specific terms of such employment (there could be occasion for "interest" arbitration in case of an impasse).
4. Discussion. The Authority is hard pressed on this appeal, for an arbitrator's award may be unassailable even if reexamination would suggest that it is wrong in fact, or in law, or in both (including errors in the interpretation of agreements and statutes).[9] This proposition still leaves room for oblique attack on grounds in some sense "jurisdictional"  that the arbitrator exceeded his powers by acting beyond the scope of the reference, or, as in some well known *110 cases of arbitration between unions and public authorities, that some statute or policy exists, pointing against a "delegation" of the subject matter to arbitration, that is strong enough to supervene and overcome an award otherwise impregnable. See Chief of Police of Dracut v. Dracut, 357 Mass. 492, 500-502 (1970); School Comm. of Braintree v. Raymond, 369 Mass. 686, 689 (1976); Boston Teachers Local 66 v. School Comm. of Boston, 386 Mass. 197, 211-213 (1982).
(a) The Authority appears to suggest that section 111 of the collective agreement is to be read to mean that there is a bare obligation merely to confer about recognition of a "new form of transportation" as involving Union work, this being antecedent to any conference about terms of employment. The decision and award reject this interpretation and hold that a new form of transportation is brought under the collective agreement by section 111 itself; and, as indicated earlier, Ride is such a new form of transportation. Here we have simply a dispute in which the arbitrator has the upper hand.
(b) Section 5(k) of G.L.c. 161A about "new routes" is advanced by the Authority as a supervening objection to the award. We gather that an objection on such a "jurisdictional" ground was never made at the hearing before the arbitrator, and the objection made now has all the appearance of an attempt to rewarm a lost quarrel over the substance of the arbitrator's decision in the guise of a contest over the limits of his powers to decide. See School Comm. of West Springfield v. Korbut, 373 Mass. 788, 792-793 (1977). The burden may fall on the court to interpret § 5(k) if the claim is seriously made that it is one of those singular statutes to which an arbitration award cannot be proof. If we should assume that burden provisionally, we need go no further than to say that we would interpret the § 5(k) reference to "new routes" just as the arbitrator did, that is, as not extending in physical terms to the Ride enterprise; and so there is no meritorious challenge to the award.
(c) The Authority asserts that the arbitrator's finding about the 13(c) agreement was outside the permissible scope *111 of the arbitration as outlined by the "issue." An arbitration may be extended by consent, which can be inferred from mutual acquiescence, and we may well assume, in the absence of a demonstration to the contrary, that the arbitrator's decision about the 13(c) agreement had some foundation in the hearing. Compare Mass.R.Civ.P. 15(b), 365 Mass. 761 (1974) (amendments to conform to the evidence). There is no indication that the Authority made any protest at the time. However this may be, the award itself relies on a violation of the collective bargaining agreement, not the 13(c) agreement, and it will not alter the result of this appeal if we should regard what the arbitrator said about a violation of the latter agreement as surplusage.[10]
The Authority goes on the attack by claiming that the Urban Mass Transportation Act, see 49 U.S.C. § 1607(e) (Supp. III 1979), states a supervening national policy that must defeat the award. We understand the argument to be that there was a design to discourage the State agencies from using Federal funds to compete with private transportation companies. But the Authority by its own act  if the arbitrator's findings be credited  has made THEM for the present purpose not a private company.
5. On "mootness." With a notable lack of elaboration, the Authority says the whole case has been mooted by the expiration of the collective bargaining agreement on December 31, 1980. The Union says the agreement continued under a carry-over provision. It is not stated that any doubt about the life of the agreement was mentioned to the judge below who granted summary judgment in June, 1981. On the record, we are in no position now to sign a death certificate. Of course the obligation of an award need not be coterminous with the agreement under which it is rendered (cf. Boston Lodge 264 District 38, Intl. Assoc. of Mach. v. *112 Massachusetts Bay Trans. Authy., 389 Mass. 819, 821 [1983], and authorities there cited); and we note, at all events, that the present award, if lawful, ran for a considerable period before the supposed termination date of the agreement, and for that period, at least, the Authority presumably would be accountable.
By St. 1980, c. 581, § 8, amending G.L.c. 161A, § 19, the directors of the Authority were disabled from entering into collective bargaining agreements with respect to "matters of inherent management right" which included the right "(vi) to determine whether goods or services should be made, leased, contracted for, or purchased on either a temporary or permanent basis." This statute, the Authority argues, is inconsistent with such a provision as section 102 of the instant collective bargaining agreement regarding subcontracting; wherefore, the argument goes, the present case has become moot. This thought may also be a recent contrivance, as it seems not to have been put to the judge in June, 1981, although St. 1980, c. 581, had become effective on December 8, 1980. There is no attempt to demonstrate that the legislation on the particular point was intended to operate retrospectively (see Boston Lodge 264, 389 Mass. at 821-823, including the reference there to Local Div. 589, Amalgamated Transit Union v. Massachusetts, 666 F.2d 618 [1st Cir.1981], cert. denied, 457 U.S. 1117 [1982]), and in any event the arbitrator has found that the arrangement with THEM was in truth not a "subcontract." Thus the argument for mootness seems feeble.
Judgment affirmed.
NOTES
[1] While confirming the arbitrator's award, the order denied the Union's claim for attorney's fees and damages.
[2] The Union filed a notice of cross appeal from the judgment so far as unfavorable to itself (see n. 1), but on the Authority's motion to dismiss the cross appeal as untimely the Union withdrew it.
[3] A pilot contract with THEM was dated April 4, 1977.
[4] The detail is found in the contract of December 29, 1978.
[5] Concluding his analysis, the arbitrator wrote: "If the Ride is not a traditional bus service then it must be a new form of transportation. In either case the facts lead inexorably to the conclusion that the work associated with the Ride service comes within the jurisdiction of the Local 589 bargaining unit."
[6] The arbitrator put the point thus: "If management did not violate the agreement by improperly assigning bargaining unit work to non-unit employees, it clearly violated Section 102 by entering into a subcontracting arrangement with THEM ... for the performance of bargaining unit work."
[7] "[W]henever the authority desires to add new routes for service in any area, it shall give preference in the operation of such routes to the private carrier then serving such area unless the authority concludes that such carrier has not demonstrated an ability to render such service according to the standards of the Authority, that such service can be operated directly by the authority at substantially lesser expense to the authority and the public than if operated by such private carrier, or that for substantial and compelling reasons in the public interest operation by such private carrier is not feasible."
[8] The arbitrator proceeded to find, alternatively, that "respecting the commitments in collective bargaining agreements" would be a "substantial and compelling reason in the public interest" within § 5(k) for the Authority's absorbing Ride rather than subcontracting with THEM outside the range of the collective agreement with the Union.
[9] There is discussion in the briefs whether the present arbitration fell under G.L.c. 251, or G.L.c. 150C, or under "common law." (Compare the remarks in Boston Lodge 264, District 38, Intl. Assoc. of Mach. v. Massachusetts Bay Transp. Authy., 389 Mass. 819, 820 n. 1 [1983].) Error of fact or law is not a stated ground for vacating an award under either statute, nor is it a basis for overturning an award in arbitration conducted apart from statute. See Kesslen Bros. v. Board of Conciliation & Arbitration, 339 Mass. 301, 302 (1959).
[10] It happens that the 13(c) agreement has a provision incorporating the arbitration procedures set out in collective bargaining agreements between the Authority and this and other unions, so that there is basis for a contention that an award nominally under the collective agreement may comprehend an interpretation of the 13(c) agreement. As indicated, this path need not be followed to the end.