School Committee of Peabody *vs.* Peabody Federation of Teachers, Local 1289, AFT, AFL-CIO, & another.[1]

Essex. December 15, 1983. — January 18, 1984.

Present: Greaney, Cutter, & Perretta, JJ.

*School and School Committee,* Appointment of personnel, Collective bargaining, Arbitration.

In an action by a school committee seeking to vacate an arbitrator's award under a collective bargaining agreement between the committee and a bargaining unit consisting of "all classroom teachers including . . . heads of departments," the record did not establish that the arbitrator had infringed on the committee's exclusive managerial prerogative by interpreting the agreement as precluding the school committee from discharging members of the teachers' unit while transferring members of a bargaining unit of administrators to newly-created department head positions in which they were to perform teaching and supervisory duties. [392-395]

CIVIL ACTION commenced in the Superior Court Department on July 1, 1982.

The case was heard by *Irwin, J.*

*Deborah L. McCutcheon* for the defendants.

*Daniel B. Kulak,* Assistant City Solicitor, for the plaintiff.

CUTTER, J. A collective bargaining agreement (the agreement) was in force for the period September 1, 1979, through August 31, 1981, between the school committee (the committee) and the Federation (the union) covering a bargaining unit (Unit A) which included classroom teachers. This agreement provided that any "complaint . . . that there has been a violation, misinterpretation, or inequitable application of any of the [agreement's] provisions" shall be subject to arbitration through the American Arbitration

---

[1] Kay Latter, president of Local 1289.

Association.[2] With respect to a layoff and certain transfers, for the school year 1981-1982, of employees in the industrial arts and home economics departments of the Peabody schools, a matter was referred to an arbitrator. The present proceeding was brought by the committee to vacate the arbitrator's award which, in part at least, sustained the union's contention. A Superior Court judge granted the committee's motion to vacate. The case is before us on the union's appeal concerning his decision.

On the basis largely of the arbitrator's award, the facts are stated below as fully as matter set forth in the award permits.

(A) Professional employees of the Peabody schools "have been organized into two bargaining units: *Unit A . . .* all classroom teachers including . . . heads of departments . . . and *Unit B . . .* loosely all administrators with the exception of excluded positions such as Superintendent."[3] The committee anticipated budget reductions in both units for 1981-1982 "[b]ecause of declining enrollments and the fiscal impact of proposition 2½." See St. 1980, c. 580, as amended by St. 1981, c. 782. Some 287 members of Unit A were sent "layoff" notices in early April, 1981. These Unit A members included several department heads. The layoff notices, if any, then sent to Unit B members do not appear in the record. The notices to Unit A members were sent to provide the committee with "flexibility in the face of contractual and statutory notice restrictions."

(B) Apparently upon recommendation of the superintendent of schools, the committee voted on May 21, 1981, to

[2] The record unfortunately does not include a copy of the Unit A agreement for classroom teachers and certain others, except as portions of it have been quoted by the arbitrator. It also does not include a copy of any bargaining agreement for employees with administrative duties included in Unit B, mentioned below.

[3] The union's brief states that it was certified some time ago, by the Labor Relations Commission to represent both Unit A and Unit B, by "*Peabody School Dept.,* M.C.R. 29 (Sept. 29, 1966)," an unpublished decision not included in the record or in either brief. There is no occasion to consider whether, in the situation now before us, there may exist an inappropriate conflict of interest in the representation of both units by the same union.

create in Unit A "department chairman positions in place of full-time supervisory positions" in Unit B, and to "[a]dvertise [these] positions and include present [Unit B] supervisors as applicants." This would have "the effect of transferring the cost of the diminished supervis[ion], as with other department heads, to the teaching function." On May 26, 1981, the committee voted to post "job descriptions for new positions of Department Head-Home Economics, and Department Head-Industrial Arts." The posting (on May 22, 1981) of these positions as vacancies noted that each "position will include $1,500 in addition to the salary the applicant would earn as a teacher."[4] On June 23, 1981, the committee voted, on recommendation of the superintendent, to "transfer Grace Fitzpatrick to Department Head-Home Economics, and Jeremiah Ryan to Department Head-Industrial Arts,. for the 1981-82 school year."[5] The arbitrator indicates that teachers other than department heads teach five periods each day, have one period for administrative work, and one period for preparation, whereas a department head teaches only three periods a day, does administrative work three periods a day, and has one period for preparation.

(C) The arbitrator concluded that the Unit A collective bargaining agreement draws no distinction between a department head and any other teacher. Neither his report nor any other part of the record discloses what supervisory or managerial functions, if any, a Unit A department head

---

[4] Each position description for the vacancy specified as "qualifications" (1) a master's degree, (2) a State teacher's certificate, and (3) three years' teaching experience in the field of specialty.

[5] Mrs. Fitzpatrick and Ryan were then or later given a seniority date of 1965 on the Unit A seniority list. It does not appear on this record what their past teaching experience had been and what their qualifications were or whether 1965 was the seniority date of these persons as members of Unit B or as employees of the Peabody school system. In any event, the arbitrator's award states that, at the hearing before him, the committee "conceded that according to [the] contract the correct date for [Mrs.] Fitzpatrick and Ryan on the Unit A seniority list should have been their July 1, 1981, date of 'reentrance' into that unit."

is required to exercise. He ruled that he, as arbitrator, could not distinguish in any manner between department heads and other members of Unit A, and that the two department heads transferred from Unit B had become (see note 5, *supra*) ordinary members of Unit A as of September, 1981, with zero seniority. He found, in the then recent history of collective bargaining for the Unit A agreement (prior to the signing of the agreement or agreements applicable to the situation here discussed), no agreement on the part of the union to convert any "part of Unit B seniority to Unit A seniority."

The arbitrator held in effect that, under the applicable agreement, the two transferred employees could not be assigned Unit A teaching functions before any laid off Unit A teachers, senior to them and within the same areas of certification, had been offered appropriate recall to teach. He directed that the committee make whole those laid off teachers who would have been recalled, if violations by the committee of the seniority and layoff provisions of the Unit A agreement had not occurred.[6]

(D) The trial judge, in vacating the arbitrator's award, concluded "that the appointment of a department head is" a responsibility "that a school committee cannot delegate to collective bargaining or to arbitration." He relied on *Boston Teachers Local 66* v. *School Committee of Boston,* 386 Mass. 197, 211 (1982, hereafter referred to as "the 1982 decision") where it was said, "In the context of public education . . . specific appointment determinations, and decisions to abolish positions are within the exclusive managerial prerogative of a school committee, and thus beyond the scope of collective bargaining."

1. The trial judge, doubtless, viewed the agreement (as interpreted by the arbitrator) as having the inevitable effect of thwarting the committee's understandable efforts to ob-

---

[6] The arbitrator took the position that whether his interpretation of the Unit A agreement resulted in impinging on the committee's "nonnegotiable" statutory rights was not for his decision, as "lying beyond the contractual issues placed before" him.

tain a more efficient and less costly operation of the school department as a whole. This obviously was to be accomplished by reducing the less significant supervisory duties of the two transferred Unit B employees and getting these employees to assume some teaching functions. Thus he seems to have treated the agreement as a violation of the principle quoted above from the 1982 decision. We consider whether the judge had justification in this record for thus viewing the layoff and seniority provisions of the applicable Unit A agreement as interpreted by the arbitrator.

(a) The committee had bound itself by provisions in the Unit A agreement (as interpreted), which in effect precluded transfers from Unit B to Unit A without loss of seniority. It required layoffs of any teachers in Unit A to be in reverse order of seniority. Seniority, under the agreement as interpreted, was to be determined solely by seniority within the particular unit and not as a matter of seniority throughout Units A and B for employees with teaching qualifications. The arbitrator apparently also interpreted the agreement as preventing the committee from making new appointments which involved any teaching without assuming as a consequence at least the burden of considering whether members of Unit A, either not laid off or available for recall, were qualified to fill the particular vacancies.

(b) Doubtless the general terms and form of the Unit A agreement were negotiated in the climate of circumstances existing well before the 1980 enactment of Proposition 2½ and in the light of any policy of the Labor Relations Commission of separating school employees into separate units for collective bargaining, consisting of (1) teachers, on the one hand, and (2) managerial or supervisory employees, on the other hand. See the discussion in *Chicopee School Committee,* 1 M.L.C. 1195 (1974). Proposition 2½, by its restrictions in 1980 on expenditures, may have affected materially whether such a dichotomy is still appropriate in view of its indirect consequences.

The lay-off, recall, and seniority provisions of the applicable Unit A agreement, even after 1980, presumably have

usefulness in matters which have no impact upon policy decisions and managerial functions of the school committee reserved to them by statute and, indeed, somewhat obscurely by a provision of the agreement itself (art. X.A). Nevertheless, in a situation like the present, these provisions, although not *directly* repugnant to the school committee's statutory prerogatives, may well have operated indirectly, as the trial judge perceived, to obstruct elimination of dispensable full time supervisory employees and use of the teaching qualifications of such employees, with reduced supervisory duties. On this record, however, the committee has not established (1) that (when dealing with the union in framing the agreement here applicable) the committee refused, after reasonably expeditious negotiations to an impasse in good faith, to insert such seniority provisions in the Unit A agreement without also including specific reservations protecting the flexible exercise of the committee's policy making functions, or (2) that the committee had made any necessary application to the Labor Relations Commission for a revision of its certification of bargaining units for the school department employees, to adjust them so that the committee could deal appropriately with the problems presented by Proposition $2\frac{1}{2}$. Indeed, as already noted, the committee has not shown on this record to what extent, and in what respects, a Unit A department head exercises supervisory functions. Such a showing is a necessary preliminary to an appraisal whether any indirect interference caused by the applicable agreement with any appointment (as a department head) violates policy making prerogatives of the school committee.

2. In the light of the considerations discussed in the next preceding part of this opinion, the present record does not permit now a conclusion that the applicable Unit A agreement interferes improperly with the exercise of nondelegable and nonarbitrable powers of the committee.[7] Before

---

[7] We have given consideration to *School Comm. of New Bedford* v. *New Bedford Educators Assn.*, 9 Mass. App. Ct. 793, 797-801 (1980), and

any subsequent agreement is negotiated with the union, the committee will have opportunity to seek revision of the seniority provisions of the Unit A agreement and to make any appropriate application to the Labor Relations Commission concerning the bargaining units. On the present record, we treat the committee as bound, for the academic years involved in the present dispute, by the agreement which they have signed, perhaps improvidently. In the circumstances, we cannot see that recommittal of the dispute to the arbitrator would serve any useful purpose.

3. The arbitrator's award should not have been vacated on the present record. The judgment is reversed. The union's "motion" to confirm the arbitrator's award is to be allowed. The "motion" to vacate the arbitrator's award is to be denied.

*So ordered.*

cases there cited. We are not persuaded that the present case is controlled by *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 561-567 (1983), a decision dealing with school custodians, greatly relied on by the union.